*Decisions will be entered under Rule 50.*

FRED ROSENTHAL AND IRENE ROSENTHAL, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5214-65—5218-65. Filed June 30, 1967.

*Willard I. Zucker,* for the petitioners.
*Edward H. Hance,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in the income tax of Fred and Irene Rosenthal, Fenya Ginzberg, Joachim Ginzberg, Leo and Zara Eliash, and Estate of Fanny Golodetz, deceased, Efim Golodetz, administrator, and Efim Golodetz for the calendar year 1960 in the amounts of $2,461.15, $757.21, $31,681.07, $9,223.28, and $7,947.15, respectively.

---

[1] Proceedings of the following petitioners are consolidated herewith: Fenya Ginzberg, docket No. 5215-65; Joachim Ginzberg, docket No. 5216-65; Leo Eliash and Zara Eliash, docket No. 5217-65; and Estate of Fanny Golodetz, Deceased, Efim Golodetz, Administrator, and Efim Golodetz, docket No. 5218-65.

The issues for decision are:

(1) Whether the casualty loss in 1960 with respect to timber held by a joint venture in which petitioners held varying percentage interests should be limited to the basis of the specific timber which was damaged or limited only by the basis of the timber in the tract with respect to which damage was suffered.

(2) Whether a partnership composed of petitioners Joachim Ginzberg, Leo Eliash, and Efim Golodetz sustained an ordinary or a capital loss in 1960 with respect to stock held by the partnership in a Cuban corporation.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Fred and Irene Rosenthal, who resided at the time of the filing of the petition in this case in Leonia, N.J., filed their joint Federal income tax return for the calendar year 1960 with the district director of internal revenue, San Francisco, Calif.

Fenya Ginzberg, who resided at the time of the filing of her petition in this case in New York, N.Y., filed an individual income tax return for the calendar year 1960 with the district director of internal revenue, Manhattan, N.Y.

Joachim Ginzberg filed his individual Federal income tax return for the calendar year 1960 with the district director of internal revenue, Manhattan, N.Y.

Leo and Zara Eliash filed their joint Federal income tax return for the calendar year 1960 with the district director of internal revenue, Manhattan, N.Y.

Fanny Golodetz, who is now deceased, and Efim Golodetz, filed a joint Federal income tax return for the calendar year 1960 with the district director of internal revenue, Manhattan, N.Y.

### Casualty Loss Issue

Irene Rosenthal and Fenya Ginzberg owned a 6⅔-percent interest and a 3⅓-percent interest, respectively, in a joint venture organized under the laws of the State of New York and known as Namarib Company-Timber Venture.

Namarib Co. is a partnership organized under the laws of the State of New York, and this partnership during the calendar year 1960 owned a 67½-percent interest in the Namarib Company-Timber Venture (hereinafter referred to as the joint venture).

During the calendar year 1960 Joachim Ginzberg owned a 60-percent interest and Efim Golodetz and Leo Eliash each owned a 20-percent interest in the Namarib Co. partnership.

On January 1, 1960, the joint venture owned a timber tract in the State of Tennessee, consisting of 24,605.6 acres of which 19,734.7 acres had been acquired on August 7, 1951, for $300,000 and the remaining 4,870.9 had been acquired on March 20, 1956, for $60,000. The joint venture set up this tract on its books by allocating $93,825 of the purchase price of $300,000 (to which were added certain capitalized expenditures) to the land and $217,875 to the timber, and allocating the purchase price of $60,000 (to which were added certain capitalized expenditures) between land and timber on the basis of $19,225.93 to the land and $44,800 to the timber.

The adjusted basis of the land on January 1, 1960, was $113,080.93, and the cost basis of the timber to the joint venture as of January 1, 1960, was $212,476.30. The depletion deducted on the joint venture's U.S. partnership return of income for the calendar year 1960 was $2,633.90. The estimated board feet of saw timber in the tract as of January 1, 1960, used in arriving at the depletion deduction taken on the return of the joint venture was 58,445,000.

On March 2, 1960, an ice storm struck the southern central section of the Tennessee River Basin and adjacent areas outside of the basin. The joint venture's timber tract was located within the area of the Tennessee River Basin where the storm occurred and the timber on this tract suffered damage as a result of the ice storm. There was also damage caused by the ice storm to plantations on the timber tract, and respondent allowed the full amount of deduction claimed by the joint venture for the damage to these farms.

After taking into account salvage, the loss of the joint venture was 4,757,100 board feet of saw timber and 5,058.3 cords of pulpwood. The 4,757,100 board feet of saw timber was composed of 3,663,500 board feet of Virginia and shortleaf pine which had a fair market value as of March 2, 1960, of $24.20 per 1,000 board feet; 211,250 board feet of hemlock which on March 2, 1960, had a fair market value of $18 per 1,000 board feet; 145,650 board feet of pine which had a fair market value as of March 2, 1960, of $15.60 per 1,000 board feet; and 736,700 board feet of hardwoods which had a fair market value as of March 2, 1960, of $13.65 per 1,000 board feet.

Pulpwood is the wood from trees which are at least 4 inches in diameter at breast height but are below 8 inches in diameter at breast height. Trees 8 inches or more in diameter at breast height are saw timber size. The fair market value at March 2, 1960, of the 5,058.3 cords of pulpwood which the joint venture lost as a result of the ice storm was $2.30 per cord.

In addition to the loss of the saw timber and pulpwood which the joint venture sustained as a result of the ice storm, there was also

a loss of young growth of trees which measured less than 4 inches at breast height. These young trees were a result of natural growth from seed on the joint venture's land and were not trees which had been planted by the joint venture. The fair market value as of March 2, 1960, of the naturally produced young growth lost as a result of the ice storm was $12,173.

The fair market value of the entire timber tract of 24,605 acres immediately preceding the ice storm of March 2, 1960, exceeded the fair market value of this entire tract after the storm by at least $130,000.

The following schedule shows the sales of timber in thousands of board feet and in dollars made by the joint venture and the expenses (other than depreciation and depletion) incurred by the joint venture in connection with the tract for the calendar years 1951 through 1965:

| Year | Sales | | Expenses excluding depreciation and depletion |
| | In thousands of board feet | Dollar value | |
|---|---|---|---|
| 1951 | | | $4,683.82 |
| 1952 | 324 | $6,537.08 | 36,402.77 |
| 1953 | 2,716.171 | 66,365.12 | 53,923.84 |
| 1954 | 2,534.830 | 66,933.24 | 63,620.57 |
| 1955 | 3,099.208 | 97,731.15 | 81,147.26 |
| 1956 | 2,050.443 | 51,456.58 | 47,597.61 |
| 1957 | 900 | 25,912.49 | 33,846.36 |
| 1958 | 2,000 | 31,864.81 | 28,278.99 |
| 1959 | 1,766 | 33,303.63 | 34,962.38 |
| 1960 | 1,725 | 28,740.14 | 44,964.90 |
| 1961 | 996 | 17,909.51 | 55,604.70 |
| 1962 | 1,408 | 24,456.31 | 52,915.30 |
| 1963 | 1,418 | 21,618.24 | 58,527.51 |
| 1964 | 936 | 11,490.12 | 55,244.04 |
| 1965 | 1,258 | 8,513.73 | 50,731.67 |
| Total | 23,131.652 | 492,832.15 | 702,451.72 |

From 1953 until the time of the trial of this case the joint venture's timber tract had been managed by Charles R. Page, Jr., a consulting forester. Page at all times managed the tract with an effort toward promoting the best forest management practices. This management entailed timber stand improvement by hardwood control which consisted of planting of trees, both hardwood and pine, to improve and reinforce areas that did not have sufficient number of trees or trees of the right quality and kinds, as well as taking measures to protect the area from fire, insects, and disease. In his timber management of the joint venture's tract, Page also made sales for the joint venture of the timber which should be sold to carry out best forestry practices. Originally sales were of the low quality hardwood entirely, in order to have it removed from the area and promote the development and growth of pine.

In 1956 there had been some salvaging of timber as a result of a windstorm and in 1960 there was salvaging as a result of the ice storm. After the 1960 storm some areas were "clear cut" which means that all trees on the property were cut in order that the area might be planted with pine. The timber which was cut in each year would amount to approximately one-half of the growth of timber in that year. In some timber tracts, depending on the condition of the forest when the management of the tract started, the timber cut will be more, and in some less, than 50 percent of the timber growth in the tract. Generally, in a forest management program, the manager attempts to avoid cutting in any 1 year in excess of 75 percent of the growth in that year until the timber stand is built up to a reasonable intensity. Most of the stands in the area in which Page acted as a manager were understocked, but the tract of the joint venture was somewhat above average for the area.

The joint venture on its partnership return of income for the calendar year 1960 reported the amount of $24,237.52, which it made from the sale of timber as capital gain. This amount was computed by subtracting from a gross sales price of $27,999.85, depletion of $2,633.90, and expenses of $1,128.43. The sales made by the joint venture in 1960, as they had been for prior years, were of "stumpage" which means that the joint venture sold standing timber and the purchasers cut it. The timber to be cut would be marked by an employee of the joint venture. The joint venture on its partnership return of income for the calendar year 1960 claimed a casualty loss from the storm of $130,-500.38 which it computed by adding to the $104,787.29 which it determined to be the fair market value of the 4,757,100 board feet of saw timber lost as a result of the storm, the fair market value of $11,634.09 of pulpwood lost as a result of the storm and $12,173 as fair market value of the young growth destroyed by the storm, plus $1,906 damage to plantations on the timber tract.

Respondent in his notice of deficiency to each of petitioners disallowed a portion of the casualty loss claimed by the joint venture from the loss of timber. His determination was that the allowable amount of the casualty loss was $17,315.48, which he computed by use of 4,757,100 board feet of saw timber being lost as a result of the ice storm with a cost basis to the joint venture of $3.64 per 1,000 board feet. Respondent arrived at the amount of $3.64 per 1,000 board feet of saw timber to be multiplied by the board feet of saw timber lost in the storm to obtain the total deductible casualty loss by dividing the total estimated board feet of saw timber in the tract owned by

the joint venture as of January 1, 1960, of 58,445,000 into the total basis of the timber on the tract of $212,476.30.

## Stock Loss Issue

Namarib Co., a partnership (hereinafter referred to as the partnership) in 1951 purchased 406 shares of stock in a Cuban company known as Centrale San Jose Portugalete, S.A. (hereinafter referred to as Portugalete) for $265,000. The 406 shares represented 36 percent of the total stock of Portugalete. The other stockholders of Portugalete in 1951 were Domingo Bures (hereinafter referred to as Bures) and Senor Sanchez (hereinafter referred to as Sanchez), who owned 52 percent and 12 percent of the stock, respectively. Bures and Sanchez purchased their stock in Portugalete at the same time the partnership purchased its stock.

The partners of the partnership in 1951 were Joachim Ginzberg, Leo Eliash, Efim Golodetz, Simon Golodetz, and Mark Ginzberg.

The partnership traded in a number of commodities as well as owning an interest in timberlands through the joint venture. These commodities included rubber, cocoa, metals, molasses, and sugar.

M. Golodetz & Co. (hereinafter referred to as Golodetz Co.) is a partnership organized under the laws of the State of New York which for sometime prior to 1951 and until the time of the trial of this case, was engaged in trading in various commodities, one of the principal commodities in which it traded being sugar. In 1951 the partners of Golodetz Co. were Joachim Ginzberg, Efim Golodetz, Mark Ginzberg, Simon Golodetz, Jura Ginzberg, and Michael Golodetz. Joachim and Mark Ginzberg were brothers, and Efim Golodetz, Simon Golodetz, and Leo Eliash were cousins of Joachim and Mark Ginzberg. Jura Ginzberg was the father of Joachim and Mark Ginzberg and the uncle of Efim and Simon Golodetz who are brothers. Michael Golodetz was the uncle of Joachim and Mark Ginzberg and Efim and Simon Golodetz.

Prior to and during 1951 Golodetz Co. was buying both refined and raw sugar from Cuba as well as from Brazil, Mexico, India, Argentina, and Puerto Rico. The major source of refined sugar purchased by Golodetz Co. in Cuba prior to 1951 and thereafter until such time as Portugalete commenced refining sugar was "Pearl White" a refinery with which Golodetz Co. had a close relationship.

There was a quota placed on imports of Cuban sugar to the United States and it was advantageous to the Cuban refineries to sell sugar to purchasers in the United States to the limit of their quota. The refined sugar sold by Golodetz Co. carried a higher profit margin than the raw sugar sold by the company and therefore Golodetz Co. was

interest in making as high sales as possible for refined sugar. The refined sugar imported from Cuba which was within the quota allotted to the Cuban refinery had 20 percent less import duty than other refined sugars imported into the United States and this was an economic advantage to Golodetz Co. as an importer.

In 1951 there were approximately six sugar refineries in Cuba, and the two largest of these had their own selling organizations in the United States.

In 1951 Bures was president of West Indies Trading Co., a company which was related to Golodetz Co., and one of his duties as president of that company was to locate supplies of sugar, especially refined sugar, in Cuba for Golodetz Co. Bures had been representing Golodetz Co. in Cuba since 1937.

In 1951 a lawyer for the estate of a deceased Cuban offered for sale all of the stock of Portugalete, all of which was then owned by the estate the lawyer was representing. This lawyer offered this stock to Bures, giving him a 30-day option for its purchase. Bures informed the partners of Golodetz Co. and Sanchez of the offer and solicited their participation in the purchase of the stock. Bures talked with Joachim Ginzberg and Efim Golodetz about the offer. Joachim Ginzberg did not want competitors of Golodetz Co., both in Cuba and New York, to know that Golodetz Co. was a large stockholder in Portugalete.

In 1951 the partners in Golodetz Co. had discussed with Leo Eliash who owned a 20-percent interest in the Namarib Co. partnership the possibility of his becoming a partner in Golodetz Co. Leo Eliash became a partner in Golodetz Co. in 1956.

At the time in 1951 when the partnership, Bures, and Sanchez purchased all of the stock of Portugalete, the mill had no refinery. Bures knew there was a refinery known as Fontecha refinery for sale which had not been operating for some years because of being located in Havana which was not in close proximity to a sugar mill or sugar field. In 1952 Bures started negotiations to purchase the Fontecha refinery for Portugalete and in 1953 closed the transaction, buying both the refinery and the refinery's quota to export the sugar to the United States. After Portugalete purchased the Fontecha refinery in 1953, it had it dismantled, moved to the location of its mill, reconstructed and started it in the operation of refining sugar in 1955.

Prior to the acquisition by the partnership of the stock of Portugalete, neither that partnership nor Golodetz Co. nor any of the partners of either owned any stock or financial interest in any Cuban sugar mill or refinery.

In 1951 Portugalete owned approximately 8,000 to 9,000 acres of land on which sugar cane was grown and a sugar mill in which raw sugar was ground.

Bures was desirous of purchasing stock of Portugalete in order to obtain personally the lease of the land on which to grow sugar cane and sell that cane to the mill. Sanchez was interested in purchasing stock of Portugalete in order that he might personally obtain the right to plant tomatoes on a part of the land owned by Portugalete to supply a tomato-canning factory which he owned at a nearby location.

Subsequent to the purchase of 36 percent of the stock of Portugalete by the partnership, Golodetz Co. obtained the major portion of the output of the Portugalete mill and later, when the refinery began operation, obtained substantially all of the output of the refinery. Golodetz Co. paid the prevailing market price for sugar purchased from Portugalete and paid for the sugar at the time it was purchased in accordance with Cuban requirements. All of the production of Portugalete for its fiscal year ended June 31, 1951, was sold to Galban Lobo & Co.

From 1952 through 1959 Golodetz Co. purchased in the various years from 66 to 100 percent of the raw sugar milled by Portugalete and for the years 1956 through 1959 purchased all of the refined sugar, except for less than one-half of 1 percent of such refined sugar in the year 1957, produced by Portugalete.

Prior to 1957 the only purchases by Golodetz Co. of refined sugar from sources other than Cuba were quite small and from 1957 through 1959 the purchases of refined sugar by Golodetz from sources other than Cuba were only about 30 percent of its total sugar purchases. In 1960 approximately 40 percent of the total refined sugar purchases of Golodetz Co. were from sources other than Cuba.

During the years 1951 through 1960 Golodetz acquired in the various years from 67.9 percent to 100 percent of the refined sugar it purchased in Cuba, other than the sugar it acquired from Portugalete, from "Pearl White," the lowest percentage (67.9 percent) being in 1955 and the highest (100 percent) in 1957.

From 1956 through 1959 Golodetz acquired from 34 to 38 percent in the various years of its Cuban sugar from Portugalete and in 1960 it acquired 44.4 percent of its Cuban sugar from Portugalete.

The sugar purchased by Golodetz Co. from Portugalete was shipped by common carrier. When Golodetz Co. received the bill of lading for the sugar, there would be attached a sight draft which Golodetz Co. would accept.

In 1960 the assets of Portugalete were seized by the Castro Government in Cuba.

The partnership never received any dividends or other distribution with respect to its stock in Portugalete and never received any compensation from any source with respect to its stock in Portugalete. The partnership's basis for its 406 shares of Portugalete stock at January 1, 1960, was $265,000.

On its 1960 U.S. return of partnership income the partnership reported a long-term capital loss with respect to the Portugalete stock of $265,000. This stock had been determined by the partnership to be worthless and was written off the books of the partnership by its accountant. The books of the partnership were audited by a certified public accountant who was employed by a firm of certified public accountants in New York. It was this accountant who wrote off the Portugalete stock on the books of the partnership and showed it on his audit report as a capital loss. Petitioners Joachim Ginzberg, Leo Eliash, and Efim Golodetz alleged in their petitions filed in these cases, that the loss on the Portugalete stock was erroneously reported on the partnership return of income of the partnership as a capital loss and that it should have been deducted on that return as an ordinary business loss and the resultant increased loss of the partnership for the year 1960 should have been reflected by increased partnership losses distributable to them as partners.

OPINION

### Timber Loss Issue

The parties do not disagree as to the basic facts with respect to the issue concerning the claimed casualty loss by the joint venture.

The facts show that from the standpoint of either the fair market value of the timber destroyed by the ice storm or the difference in the value of the joint venture's entire tract of timber before and after the storm, the joint venture sustained a loss of approximately $130,000. The parties have stipulated that respondent accepted a cost basis to the joint venture of the timber in the amount of $212,476.30 as of January 1, 1960.

Petitioners take the position that since the $130,000 loss computed on the basis of the fair market value of the timber lost or on the basis of the fair market value of all timber in the tract before and after the casualty is less than the cost basis of the timber in the tract of $212,476.30, the joint venture is entitled to deduct the entire $130,000 loss. Although petitioners argue that the joint venture was holding the timber primarily as an investment even though there had been cutting of some timber from the time the tract was acquired, they do not contest respondent's position that the timber on the timber

tract is properly used in a trade or business or held for the production of income. Neither do they attack respondent's regulations which provide that in the case of any casualty loss incurred in a trade or business or in a transaction entered into for profit, the amount of the loss shall be determined "by reference to the single identifiable property damaged or destroyed." [2] Petitioners' position is that all the timber on the tract should be considered as the "single identifiable property damaged or destroyed."

Respondent takes the position that the particular timber lost in the ice storm is the "single identifiable property." It is respondent's position that only the 4,757,100 board feet of saw timber lost in the storm has a basis to the joint venture and that since there is no basis to the joint venture in the pulpwood and natural regeneration, no amount of casualty loss is deductible by the joint venture with respect to those items.

Both parties cite and rely on *Carloate Industries, Inc.* v. *United States*, 354 F. 2d 814 (C.A. 5, 1966), which specifically approved respondent's regulation providing that a casualty loss incurred with respect to property used in a trade or business or in a transaction entered into for profit shall be determined by reference to the single identifiable property damaged or destroyed. In that case the court stated, at page 817, as follows:

Carloate separated the land and the trees when it purchased its groves to establish a basis for depreciation of the trees; it has since taken a deduction for depreciation of the trees. Thus Carloate has already recovered a portion of the cost of its trees through annual depreciation deductions. Under the approach urged by Carloate it would be allowed a casualty loss deduction against the

---

[2] Sec. 1.165–7(b)(1) and (2), Income Tax Regs., provides as follows:

(b) *Amount deductible*—(1) *General rule.* In the case of any casualty loss whether or not incurred in a trade or business or in any transaction entered into for profit, the amount of loss to be taken into account for purposes of section 165(a) shall be the lesser of either—

(i) The amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; or

(ii) The amount of the adjusted basis prescribed in section 1.1011–1 for determining the loss from the sale or other disposition of the property involved.

However, if property used in a trade or business or held for the production of income is totally destroyed by casualty, and if the fair market value of such property immediately before the casualty is less than the adjusted basis of such property, the amount of the adjusted basis of such property shall be treated as the amount of the loss for purposes of section 165(a).

(2) *Aggregation of property for computing loss.* (i) A loss incurred in a trade or business or in any transaction entered into for profit shall be determined under subparagraph (1) of this paragraph by reference to the single, identifiable property damaged or destroyed. Thus, for example, in determining the fair market value of the property before and after the casualty in a case where damage by casualty has occurred to a building and ornamental or fruit trees used in a trade or business, the decrease in value shall be measured by taking the building and trees into account separately, and not together as an integral part of the realty, and separate losses shall be determined for such building and trees.

bases of both the land and the trees based on a casualty loss to the trees alone and without a showing of any casualty loss to the land. To permit Carloate a casualty loss deduction in excess of the adjusted basis of its trees without a showing of loss to the land would in effect enable Carloate to recover, as a result of the destruction only of the trees, *more* than its investment in the trees and to offset this recovery against the basis of the land.

It is petitioners' position that the court, in *Carloate Industries, Inc.* v. *United States, supra*, held that the grove of citrus trees was a "single identifiable property" separate from the land. Petitioners rely for this interpretation of *Carloate Industries, Inc.* v. *United States, supra*, on *Alcoma Association* v. *United States*, 239 F. 2d 365 (C.A. 5, 1956), which was distinguished by the court in *Carloate Industries, Inc.* v. *United States, supra*.

Respondent argues that since *Carloate Industries, Inc.* v. *United States, supra*, involved a situation where all the trees on the tax-payer's property were destroyed, only a separation of the land and the trees was involved and that the court's reliance on *Bessie Knapp*, 23 T.C. 716 (1955), as well as *United States* v. *Koshland*, 208 F. 2d 636 (C.A. 9, 1953), in support of its holding and particularly its reference to the *Bessie Knapp* case being directly in point, supports the conclusion that the court was not treating all the trees in the grove as a "single identifiable property" other than for the reason that in the particular case all such trees had been destroyed. Respondent argues that *Alcoma Association* v. *United States, supra*, does not support petitioners' contention that only the timber and land should be separated in the case of the joint venture, calling attention to the fact that in that case the court merely disapproved a formula, the use of which the Commissioner was contending was appropriate in computing a partial casualty loss to business property. In the case of *Alcoma Association* v. *United States, supra*, which involved the partial destruction of a citrus grove, the court stated that the Commissioner was not attempting to distinguish the case of *Helvering* v. *Owens*, 305 U.S. 468 (1939), on the ground that it involved partial destruction of an automobile which was property of a type that could not be destroyed piece by piece without affecting the utility of the whole, and therefore clearly had an indivisible basis, whereas the case there under consideration involved trees growing on land which might be considered separately. As to the divisibility of basis of property partially destroyed the court stated:

The same is not necessarily true of a citrus grove, where the destruction of some of the trees throughout the grove, or perhaps of all the trees in a portion of the grove, leaving the rest of the trees productive, might allow for the matching of the destroyed property with particular portions of the "basis"; clearly for some

kinds of property physical separability means that each portion has its own "basis." * * *

Respondent in the instant case argues that each physically separate tree which is a portion of the timber on the joint venture's tract does have its own basis and that this is recognized in the revenue laws which provide for allowance of a deduction for depletion of timber on the basis of the units of timber cut. Respondent refers to sections 611, 612, and 631, I.R.C. 1954, and his regulations issued pursuant thereto dealing specifically with timber. Respondent calls attention to statements in section 1.611–3 and section 1.612–1, Income Tax Regs., which refer to the computation of the deduction for cost depletion in respect of timber to be made by reference to its adjusted basis provided in sections 1011, 1012, and 1016 relating to basis for the purpose of determining gain upon the sale or other disposition of such property.

Petitioners recognize that for depletion purposes specific timber cut has a specific basis and also that under section 631, the gain or loss on timber disposed of in any taxable year is the difference between the amount realized from, or fair market value of, the timber disposed of and the adjusted basis thereof for depletion purposes. Petitioners contend that basis for depletion purposes determined from the estimated timber on a tract and the estimated growth during the year is not the basis to be used for any purposes other than those specified by statute. Petitioners state that timber which is not voluntarily disposed of by the joint venture, but is involuntarily lost in a casualty should not be considered to have the same basis which it would have if disposed of under a cutting contract which would require that its basis be computed in accordance with section 631. Petitioners attempt to distinguish the circumstances in the present case from those in *Bessie Knapp, supra,* on the ground that the timber here differs from the citrus trees involved in that case and that none of the trees damaged by the casualty in the instant case were trees planted by the joint venture, the cost of planting of which had been deducted in computing taxable income. *Bessie Knapp, supra,* involved a citrus grove used in the taxpayer's trade or business of growing oranges. The instant case involves timber which is held for sale by the joint venture either in its trade or business or in a transaction entered into for profit. Even though this constitutes a distinction in the cases, if petitioners' timber were considered to be in the nature of inventory or of crops grown by a farmer, this distinction would not necessarily require a result as to the limitation of the deductible amount of the casualty loss to be determined in a manner different from that used in *Bessie Knapp, supra.* Respondent's regulations specifically provide that no casualty loss deduction is allowable for items in inventory and that no casualty loss deduction is allowable

with respect to growing crops since the cost of producing the crops has been expensed. The regulations do allow deduction for a casualty loss to capitalized items used by a farmer in his trade or business to the extent of his basis therein. See sec. 1.165–7(a) (1) and (4) and sec. 1.165–6 (c) and (d), Income Tax Regs.

The underlying theory of the limitation on the amount of a casualty loss which is deductible when the fair market value of the property lost is not the limiting factor is that the loss is limited by an amount which would otherwise at some other time be deductible for income tax purposes. If the deduction has already been taken in some other manner, it is not again allowable as a casualty loss. In *United States* v. *Koshland, supra,* the court stated that "a casualty loss of business property is measured for tax purposes by the adjusted basis of the property destroyed," citing respondent's regulations then in effect. In support of this conclusion the court pointed out that all the taxpayer in that case had lost was its hotel building, the cost of which it had substantially recovered through the years by depreciation deductions, and that to allow a deduction where the building only was lost to the extent of the basis of the land and building would be in effect to allow a loss for the land which was not injured by the fire. In effect in the instant case, to allow a deduction for more of the basis of the timber of the joint venture than that applicable to the trees damaged would be to allow a deduction for a loss to trees that were not damaged. In *Bessie Knapp, supra,* we not only considered the trees as a separate property from the land, but also separated the trees purchased by the taxpayer from trees which had been killed in the freeze which had no basis to the taxpayer because the cost of the planting and growing of the trees had been expensed. We allowed no casualty loss with respect to those trees in which the taxpayer had no basis. In determining the loss on the trees which had been on the land when it was purchased by the taxpayer in *Bessie Knapp, supra,* we did not allow the loss to the extent of the entire basis of all the trees on the land when purchased but only allowed a deduction of that percentage of the basis which we determined to be applicable to the trees lost in the freeze. Under the theory of *Bessie Knapp, supra,* as well as the underlying theory of the deductible amount of casualty losses to property connected with a trade or business or transaction entered into for profit, we conclude that where property is such that it is normally allocated a specific basis upon its disposition, as in the case of timber, a casualty loss of such property should likewise be limited to the basis of the specific property lost in the casualty. This, in effect, is the holding of *Bessie Knapp, supra.* This holding is not contrary to the holding of *Alcoma Association* v. *United States, supra,* because of the limited basis of

the decision in that case and the statements made in that case by the court as to the limited scope of the holding. We conclude that the naturally regenerated young growth lost by the joint venture in the freeze had no basis to the joint venture and therefore the joint venture is entitled to no casualty loss deduction for the loss of the young growth.

Although the pulpwood in actual fact probably had some basis to the joint venture in that it was very likely on the land as young growth at the time the joint venture acquired the land, if a portion of the basis were allocated to the pulpwood, the amount so allocated would have to be used to reduce the basis allocable to the saw timber thereby reducing the basis per thousand board feet of saw timber which respondent used to compute the basis of the saw timber destroyed in the 1960 casualty. Petitioners have made no showing of what amount of the basis in the timber, if any, should be allocated to the pulpwood. It may well be that upon proper allocation the basis of the pulpwood destroyed in the freeze added to the basis of the saw timber computed by reducing the basis of all saw timber on the tract by the basis allocated to the pulpwood on the tract would be no greater, or even less than, the basis of the timber lost by the joint venture as determined by respondent by allocating the entire basis of the joint venture in the timber to saw timber. In any event petitioners have made no showing to the contrary. Under these circumstances we accept respondent's determination of the basis of the joint venture in the timber as being the basis as computed by him of the saw timber.

### Stock Loss Issue

We have set forth in some detail the facts established by petitioner in connection with the loss by the partnership on the stock of Portugalete. From these facts we conclude that although there was a business advantage to Golodetz Co. from the purchase by the partnership of the stock of Portugalete, there is no evidence to show any necessity even for the business of Golodetz Co. in the partnership holding the stock after 1955 when the refinery got into operation. Over one-half of the stock of Portugalete was owned by Bures who was and had been since 1937, the agent of Golodetz Co. in Cuba to procure sugar. While it may have been necessary for Golodetz Co. to find someone to join with Bures in purchasing the stock and acquiring the refinery, there is no showing in the record of any reason why the stock had to be retained to obtain sugar after the mill and refinery were operating and Bures would be able to acquire the sugar for Golodetz Co. except that the stock was considered a good investment.

There is substantial evidence in the record that it was to the advantage of Golodetz Co. to have an additional source of refined sugar in Cuba. Although the evidence is not clear that when the partnership acquired the stock of Portugalete, plans were being made to have Portugalete acquire a refinery, there is some evidence to this effect in the record. Had the stock of Portugalete been acquired by Golodetz Co., we would be inclined toward the view that even though there is evidence in the record supporting the conclusion that the acquisition was primarily to assist Golodetz Co. in obtaining additional refined sugar in Cuba by helping that company's agent, Bures, get control of a mill and refinery, there is no evidence to show any necessity for retaining the stock of Portugalete after the refinery was acquired. Even if the stock of Portugalete had been acquired by Golodetz Co., the facts in this case would be distinguishable from those in *Tulane Hardwood Lumber Co.*, 24 T.C. 1146 (1955), and *Electrical Fittings Corporation*, 33 T.C. 1026 (1960), and other cases cited by petitioners which involve stock of a corporation acquired by an individual or another corporation for the purpose of obtaining a source of supply of raw materials, on the same basis that we distinguished such cases in *Missisquoi Corporation*, 37 T.C. 791 (1962). The only basis for Golodetz Co.'s holding this stock after the refinery was in operation under control of persons who were its representatives in Cuba would have been as an investment.

However, in the instant case, the stock of Portugalete was not purchased by Golodetz Co. but was purchased by the partnership, and there is no evidence of any reason for its acquisition or retention by the partnership other than as an investment. Petitioners attempt to explain the acquisition by the partnership of the stock by stating that Golodetz Co. had business reasons for not wanting its name associated with a Cuban sugar mill and refinery and that although there were some differences in the ownership of the partnership and of Golodetz Co., some of the partners in the two partnerships were the same and others were related and that in 1951 when the stock of Portugalete was acquired by the partnership, one 20-percent owner of the partnership was considering becoming a partner in Golodetz Co. and did become a partner in that company in 1956. All of petitioners' arguments with respect to the kinship of the various partners in the partnership and Golodetz Co. do not remove the fact that there were differences in ownership in these two partnerships at the time the Portugalete stock was acquired in 1951 and when the loss occurred in 1960. Furthermore, there is no adequate explanation of why, if the stock was acquired for a business purpose of Golodetz Co., that company could not have been the beneficial owner of the stock and pro-

vided the funds to pay for the stock even though legal title was put in some other name. Such an arrangement would have as effectively kept Golodetz Co.'s name unassociated with Portugalete as did the acquisition of the stock by the partnership. The evidence also fails to show that there would actually be any disadvantage to Golodetz Co. in having its competitors know that it owned stock in a sugar refinery in Cuba even though Joachim Ginzberg did not want his competitors to know that Golodetz Co. owned stock in a sugar mill and refinery. The evidence shows that other large sugar importers owned interests in sugar mills in Cuba and in fact this is one of the reasons petitioners contend created the necessity for Golodetz Co.'s having an interest in a sugar refinery in Cuba. The evidence also shows that Bures had been associated with Golodetz Co. and had been the person making the acquisition of sugar for Golodetz Co. in Cuba since 1937. Bures owned over one-half of the stock of Portugalete and insofar as the record shows Bures was known by the competitors of Golodetz Co. as a representative of that company in Cuba and his ownership of over one-half of the Portugalete stock was known by these competitors.

We conclude that petitioners have shown no adequate reason why the Portugalete stock was acquired in the name of the partnership if in fact the purchase was primarily for the purpose of obtaining Cuban sugar for Golodetz Co. While it may be that Golodetz Co. was benefitted by the partnership's acquiring the Portugalete stock, the clear inference from the record is that this stock was acquired by the partnership as an investment and may well have been a good investment for the partnership had it not been for the Castro government's taking over the Portugalete property in 1960.

The fact that no dividends had been paid on the stock prior to 1960 is explainable by the capital improvements being made by Portugalete when it purchased a refinery and placed it at the sugar mill. For all the record shows, the profits of Portugalete may have been used for this purpose, thereby increasing the value of the Portugalete stock which was owned by the partnership. The partnership may well have bought the Portugalete stock with a view to its increase in value expecting a capital gain to result at the time of its disposition. The partnership apparently held investments in other operations as indicated by its ownership of a 67½-percent interest in the timber joint venture.

Even though a partnership is not taxable as a separate entity but the distributable profit or loss of the partnership is reportable in the income tax return of the partners, the business of a partnership is a separate business from that of the partners or of another partnership. The separation of the partnership business from the business

of the partners has been recognized in varying situations. In *Hiram C. Wilson*, 17 B.T.A. 976, 979 (1929), we pointed out:

Ordinary and necessary expenses of a partnership business are properly deducted on the partnership return, and the partner then returns as an individual his distributive share of the net income of the partnership after making such deductions. He cannot take ordinary and necessary expenses of the partnership as a deduction on his individual return.

This same principle has been recognized in *Western Construction Co.*, 14 T.C. 453, 471 (1950), affirmed per curiam 191 F. 2d 401 (C.A. 9, 1951), and *Frederick S. Klein*, 25 T.C. 1045, 1051 (1956). Certainly, if a partnership and the partners are recognized as separate business units, two different partnerships should likewise be so recognized even though some of the partners are the same. The Supreme Court in *Neuberger* v. *Commissioner*, 311 U.S. 83 (1940), in holding a partner's proportionate share of partnership gains or losses from certain type transactions could be combined with his individual gains or losses from similar transactions, stated at page 89:

It is true, too, that in some cases the characteristics of partnerships as business units have been emphasized, Forres *v.* Commissioner, 25 B.T.A. 154; Wilson *v.* Commissioner, 17 B.T.A. 976, (appeal dismissed, 55 F. 2d 1086); Burns *v.* Commissioner, 12 B.T.A. 1029; Appeal of Menkin, 8 B.T.A. 1062, while in others the characteristics of partnerships as associations of individuals have been stressed. * * *

At present the statutes provide for certain treatment of partnerships as in the nature of business entities, as for example, section 707, and in other instances for the treatment of the partnership more as an association of individuals, as for example, section 702. However, the general import of the statutes and case law is that except with respect to income to be reported by the partners, the partnership business is considered as separate from that of the partners. See, for example, section 708 as to termination of partnerships. See also section 704(d) as to limitations on losses, and section 703(b) as to elections.

In the instant case the stock was acquired not by the partners of Golodetz Co. but by a separate partnership in which most but not all of the partners were the same persons as the partners of Golodetz Co. Petitioners do not contend and have offered no evidence to show that the purchase of the Portugalete stock was beneficial to any business activity of the Namarib partnership.

Petitioners have not shown that the $265,000 loss on the Portugalete stock was an ordinary loss to the partnership and we, therefore, hold that this loss was properly reported by the partnership as a capital loss.

*Decisions will be entered under Rule 50.*