Fred and Irene **ROSENTHAL** et al.,
Petitioners,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE**, Respondent.

Nos. 251–255, Dockets 31980–31984.

United States Court of Appeals
Second Circuit.

Argued Jan. 9, 1969.

Decided May 26, 1969.

Moore, Circuit Judge, dissented.

Willard I. Zucker, New York City, for petitioners.

Robert I. Waxman, Dept. of Justice, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Washington, D. C., Lee Jackson and Gilbert E. Andrews, Jr., Washington, D. C., attorneys, on the brief), for respondent.

Marvin Lyons, New York City (Debevoise, Plimpton, Lyons & Gates, New York City, D. Bret Carlson and Bruce D. Haims, New York City, of counsel), for American Paper Institute, Continental Can Co., International Paper Co., The Mead Corp., and West Virginia Pulp and Paper Co., amici curiae.

Before MOORE, FRIENDLY and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

This case comes before us on petition of the taxpayers for review of a decision of the Tax Court, 48 T.C. 515 upholding the Commissioner's determination of deficiencies in their income tax for the taxable year 1960.[1] The issue it presents for our determination is the proper method of computing a casualty loss deduction claimed under § 165 of the Internal Revenue Code for the partial destruction of a timber tract.

## I.

All of the petitioners herein either owned an interest in or filed a joint return for the taxable year 1960 with a person then owning an interest in the Namarib Company—Timber Venture, a joint venture organized under the laws of the State of New York [hereinafter venture]. Specifically, in 1960, Irene Rosenthal, with whom Fred Rosenthal filed a joint return, owned a 6⅔% interest in the venture, and Feyna Ginzberg owned a 3⅓% interest in it. The Namarib Company [Company], a New York partnership, owned another 67½% interest in the venture. Joachim Ginzberg owned a 60% interest in the Company; Efim Golodetz, with whom Fanny Golodetz, now deceased, filed a joint return, owned a 20% interest in the Company; and Leo Eliash, with whom Zara Eliash filed a joint return, owned the remaining 20% interest in the Company.

As of January 1, 1960, the venture owned a timber tract of 24,605.6 acres in Tennessee. Of this total, 19,734.7 acres had been acquired in 1951 for $300,000, and the remaining 4,870.9 acres had been purchased in 1956 for $60,000. As required by the Regulations under § 611, dealing with depletion deductions,[2] the venture allocated these purchase prices between the land and the timber on it. Thus, of the initial $300,000 expenditure (to which certain capitalized expenditures were added), $93,825 was allocated to the land and $217,875 to the timber; and of the later $60,000 purchase price (again plus capital expenditures), $19,225.93 was allocated to the land and $44,800 to the timber. As of January 1, 1960, the venture's adjusted basis in all the land was $113,080.93, and its adjusted basis in the timber was $212.476.30.[3] At that time, the total amount of saw timber on the tract was estimated for purposes of

---

1. This Court has jurisdiction to review the decision of the Tax Court by virtue of § 7482(a) of the Code. Venue in this Court is proper under § 7482(b)(1) as to all the petitioners except the Rosenthals, since all filed their 1960 income tax returns with the District Director of Internal Revenue, Manhattan, New York. Venue is proper as to the Rosenthals who filed their return with the District Director, San Francisco, California, by virtue of the stipulation they entered into with the Commissioner on May 27, 1968. § 7482(b)(2).

2. Treas.Reg. § 1.611–3(c)(2) and (d)(3).

3. The joint venture has for tax purposes treated the whole property as a single tract. See Treas.Reg. § 1.611–3(c) and (d).

determining the venture's depletion deduction to be 58,445,000 board feet.[4]

On March 2, 1960, an ice storm struck the southern central section of the Tennessee River Basin, damaging the timber on the venture's tract. It is not disputed that, as the taxpayers have contended, the fair market value of the entire timber tract of 24,605 acres immediately preceding the storm exceeded the fair market value of the tract immediately thereafter by at least $130,000. The taxpayers computed this loss, for which they have received no compensation by insurance or otherwise, as follows:

| | |
|---|---:|
| destruction of 4,757.100 board feet of saw timber (i. e., timber from trees more than 8 inches in diameter at breast height) having market value of | $104,787.29 |
| destruction of 5,058.3 cords of pulpwood (timber from trees between 4 and 8 inches in diameter at breast height) having a market value of | 11,643.09 |
| destruction of naturally produced young growth (trees measuring less than 4 inches in diameter at breast height) having a market value of | 12,173.00 |
| destruction of plantations on the tract having a market value of | 1,906.00 |
| | $130,500.38 |

On its 1960 partnership information return, the venture claimed the entire $130,500.38 as a § 165 casualty loss, and each of the taxpayers took the appropriate percentage of this amount as a deduction on his individual income tax for the same year.[5] The Commissioner allowed the $1,906 deduction for the loss of plantations [6] but disallowed all except $17,315 of the remaining amount claimed as a loss for damage to the rest of the timber. Accordingly, in his notice to each of the taxpayers, he determined a deficiency resulting from the portion of the venture's disallowed deduction each had claimed in his individual income tax return. The Tax Court upheld the Commissioner's determination, and the taxpayers petition this court for review of that decision. The American Paper Institute, Continental Can Company, Inc., International Paper Company, The Mead Corporation, and West Virginia Pulp and Paper Company have, with the permission of the court, filed a brief as *amici curiae* supporting the position of the taxpayers. For the reasons below, we affirm the decision of the Tax Court.

## II.

As noted, there is no dispute as to the market value of the taxpayers' loss resulting from the ice storm. The only point of contention is how much of this loss may be claimed as a deduction under § 165.

Section 165(a) sets forth the general rule: "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." As the Regulations make clear, a casualty loss com-

---

4. See Treas.Reg. § 1.611–3(e).

5. See §§ 701 et seq. concerning taxation of partnership income.

6. Since the record before us does not reveal the basis upon which the plantations were treated, we are unable to draw any inference as to the correctness of the Commissioner's determination of the remainder of the permissible deduction from his allowance of this item.

ing within the provisions of § 165 is deductible to the extent of (1) the difference between the fair market value of the property immediately before and after the casualty, *or* (2) the taxpayer's basis in that property, whichever amount is *less*. Treas.Reg. § 1.165–7 (b) (1). The issue on which the taxpayers and the Commissioner differ is the proper basis figure to be used in computing the amount of their loss deduction.

■ The taxpayers contend that the appropriate basis for this purpose is their basis in the entire tract. Under this theory, since the amount by which the market value of their property was reduced by the casualty ($130,500.38) is less than their basis in the property ($212,476.30), they are entitled to deduct all of the former amount. The Commissioner argues in response that the taxpayers cannot apply the whole of their basis in the tract to this partial loss, but that they must apportion that basis between the timber destroyed and that left unharmed in the manner in which they apportion basis for determining the allowable depletion allowance when timber is sold.

Briefly, the Regulations provide that deductions for depletion of timber shall be computed in the following manner. Each year the taxpayer is to estimate the total number of units of merchantable timber (e. g., board feet) on his timber tract. This number is then divided into his adjusted basis in all the timber on that tract, and the quotient obtained is called the "depletion unit." The depletion unit multiplied by the number of units of timber on the tract cut (or sold) during that year equals the amount of the depletion deduction to which the taxpayer is entitled for that taxable year.[7] Treas.Reg. § 1.611–3.

Following this formula, the Commissioner divided the taxpayers' adjusted basis in the tract as of January 1, 1960 ($212,476.30) by the total number of merchantable units of timber on the tract as of that date (58,445,000 board feet of saw timber) to arrive at a depletion unit for the timber of $3.64 per 1,000 board feet. Multiplying this figure by the number of units of merchantable timber destroyed by the casualty (4,757,100 board feet of saw timber), he arrived at $17,315.48,[8] which he claims to be the basis allocable to the timber lost.[9] This amount, substantially

7. The required calculation is:

$$\frac{\text{adjusted basis of timber on the tract}}{\text{total number of units of merchantable timber on the tract}} = \text{depletion unit}$$

$$\frac{\text{depletion}}{\text{unit}} \times \frac{\text{number of units of}}{\text{timber cut (or sold)}} = \frac{\text{depletion}}{\text{deduction}}$$

8. That is:

$$\frac{\$212,476.30}{58,445,000 \text{ board feet of timber}} = \$3.64 \text{ per 1,000 board feet}$$

$$\frac{\$3.64}{1,000 \text{ board feet}} \times 4,757,100 \text{ board feet} = \$17,315.48$$

———◆———

9. This treatment has the effect of allowing no deduction for the pulpwood or naturally produced young growth destroyed. Since both the taxpayer and the Commissioner have applied the entire basis of the tract to the saw timber in computing the depletion unit, there is no basis allocable to the pulpwood. Nor did the young growth have any basis; the trees that arose naturally subsequent to the pur-

less than the loss of market value due to the casualty, then sets the limit on the amount of the § 165 deduction to which the taxpayers are entitled.

### III.

Both the taxpayers and the Commissioner seek to draw support for their respective positions from the language of the relevant Code provisions. The relevant words of the Code are to be found in typical "Cross-reference to" cross-reference and "exception upon exception" fashion. Dilliard, The Spirit of Liberty, 213 (quotation from Learned Hand). The starting point for both is § 165(b), which provides: "the basis for determining the amount of the deduction for any [§ 165] loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property." Section 1011 provides: "The adjusted basis for determining the gain or loss from the sale or other disposition of property * * * shall be the basis (determined under section 1012 * * * [or other sections not applicable here]), adjusted as provided in section 1016." Section 1012 in turn instructs: "The basis of property shall be the cost of such property * * *."

The taxpayers argue quite simply that the "property" referred to in each of these sections is, in their case, the entire tract of timber. This is the unit of property they purchased and its cost therefore provides the relevant basis. Further, they urge, nothing in §§ 1011 or 1012, to which § 165 refers for the definition of basis "requires or suggests that their cost had to be allocated to the trees or board feet of the tract purchased."

This overly simplistic argument, we believe, is of little help. It is true that §§ 1011 and 1012 in defining the basis

of the property do not suggest any requirement that basis be allocated. But the "property" the taxpayers actually purchased was land with timber growing on it; and the Regulations make perfectly clear that for purposes of determining gain or loss on the sale of timber, the taxpayer must allocate his basis between the land and the timber. Treas.Reg. § 1.611–3(d) (3). Thus, the single property purchased—timberland—does become at least two separable properties for tax purposes. Indeed this proposition is so far beyond dispute that the taxpayers accept it unquestioningly while arguing that all the timber on the tract, separate from the land, is the relevant property for § 165 basis purposes in determining the allowable deduction for a partial loss.

The Commissioner's argument is somewhat more complex. He also begins with § 165(b): "the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 *for determining the loss from the sale or other disposition of property*" [emphasis added]. This provision he quite reasonably interprets to mean that the same basis should be used in determining a loss deduction under § 165 as would be used in computing gain or loss had the same timber been sold. And in the case of a partial sale of timber, the taxpayer's basis in all the timber on the tract must be allocated between the timber sold and that remaining. This is accomplished in the form of a depletion deduction. Thus, § 611(a) provides as the general rule: "In the case of * * * timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion * * *." And § 612 provides: "the basis on which depletion is to be allowed in respect of any property shall

chase of the tract had no cost, and, so far as the record before us reveals, the taxpayers did not choose to treat any of their original purchase price as attributable to the immature trees then on the

tract. See Treas.Reg. § 1.611–3(d)(3). The plantations, for which the Commissioner allowed a deduction, were planted at taxpayers' expense and thus had a separate basis.

be the adjusted basis provided in section 1011 for the purpose of determining the gain upon the sale or other disposition of property." As we have stated, the amount of depletion allowable in any year is determined by allocating the taxpayer's adjusted basis in all the timber on the tract equally among all the units of merchantable timber on the tract and then multiplying the basis per unit by the number of units cut. Treas.Reg. §§ 1.611–3, 1.612–1(a).

■ The taxpayers argue that § 611 is not relevant for our purposes because it provides for a depletion deduction not a tax basis of property. But again, their almost liturgical repetition of words in an area as complex as this, without supplying any convincing rationale, is to glorify semantics over substance. When the actual functioning of the depletion deduction is examined, it becomes apparent that it is *in effect* the basis used in determining the gain or loss from the sale or other disposition of timber. The depletion deduction is determined at the time the timber is cut and is dependent upon the number of units of merchantable timber cut (and the depletion unit, or adjusted basis per unit of merchantable timber on the tract). However, to ensure that the depletion deduction for the timber cut will be matched against the income derived from the sale of that timber, the Regulations further provide: "To the extent that depletion is allowable in a particular taxable year with respect to timber the products of which are not sold during such year, the depletion so allowable shall be included as an item of cost in the closing inventory of such products for such year." In short, the taxpayer obtains the benefit of the depletion deduction assignable to specific units of timber, which represents his cost in those units, only in the year when he actually disposes of the timber. Thus, the depletion deduction

allocable to specific timber has precisely the same significance as basis in the case of an ordinary sale or disposition of property: it represents the cost of the property to the taxpayer, the standard for determining whether he enjoys a taxable gain or recognizable loss upon its sale or other disposition.

■ A consideration of § 631 buttresses the Commissioner's analysis. Section 631(a) provides: "If the taxpayer so elects on his return for a taxable year, the cutting of timber * * * during such year by the taxpayer who owns * * * such timber * * * shall be considered as a sale or exchange of such timber cut during such year. If such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, *and the adjusted basis for depletion of such timber in the hands of the taxpayer * * *"* [emphasis added].[10] And, as the Regulations make clear, "the adjusted basis for depletion of such timber" to be used in determining the gain or loss to be recognized upon a sale under § 631 equals the depletion unit applicable to the timber on the tract multiplied by the number of units of timber cut (and treated as sold). Treas.Reg. § 1.631–1(d). Manifestly then, when the taxpayer makes an election to treat the cutting of timber as a constructive sale of such timber, he is required to allocate a portion of his adjusted basis in the entire tract to the specific timber cut—and that basis *is* the depletion deduction applicable to such timber provided for in § 611.

This analysis, we believe, conclusively rebuts taxpayers' contention that the only basis available for use in determining the amount of their allowable deduction under § 165 is their basis in the entire timber tract. Rather, it is quite obvious that the basis used in determin-

10. The advantage to the taxpayer of making an election under § 631 is that he may then treat the gain or loss to be recognized at the time of the constructive sale as arising from a sale or exchange under § 1231. Treas.Reg. § 1.-631–1(a). Thereafter, any subsequent gain or loss upon the actual sale of such timber shall be determined in accordance with Treas.Reg. § 1.631–1(e).

ing gain or loss on a partial sale or exchange of timber is that portion of the basis in the tract ratably allocable to such specific timber. And since this allocable basis is "the adjusted basis provided in section 1011 for determining the loss from the sale or other exchange" of this property (i. e., the timber destroyed), the interrelated statutory provisions do provide strong support for the Commissioner's result. We do not rest our conclusion as to the correctness of the Tax Court's decision on the statutory language alone, however, for we believe that a reasoned consideration of the basic principles governing the deduction of casualty losses generally offers even more weighty support for this result.

### IV.

The taxpayers strenuously contend that the Commissioner's result would defeat the purpose of § 165, which they say is to provide tax relief "for economic loss suffered, not for some proportionate part of that loss." This description of the statute's purpose is wholly misleading. Undeniably, § 165 was designed to afford some measure of tax relief to persons suffering uncompensated casualty losses. But, as we have stated, the amount of the loss deduction allowable under this section is in every case limited to the lesser amount of either the decrease in market value of the property as a result of the casualty or the taxpayer's basis in the property. Manifestly, the purpose of § 165 is not to allow the taxpayer a full deduction for every loss in market value his property suffers by reason of a casualty. The permissible deduction for such loss is always limited to the taxpayer's basis, or cost, in the property damaged. And the reason for this limitation is clear. Where the taxpayer suffers a loss from a destruction of market value greater than the cost of the property to him, that excess of value destroyed represents unrealized appreciation. And he may not claim a deduction for such loss because he has never recognized or paid a tax on the gain. In the extreme case, where the taxpayer's basis in the property damaged is zero, and its entire market value represents unrealized appreciation, he is entitled to no deduction despite the size of the loss, large as it may be. Consequently, taxpayers' argument that the Commissioner's result, by limiting the amount of their deduction to less than the full amount of their loss, would defeat the purpose of § 165 is simply incorrect.

The taxpayers also argue with much fervor that a partial destruction of timber is fundamentally different from a partial sale of timber, and hence the Commissioner's interpretation of § 165, requiring that the two events be treated similarly for tax purposes, produces "unreasonable" and "arbitrary" results. Thus, they urge, a timber tract is "a unique type of asset," a "vital organic unit" experiencing a continual process of growth and regeneration. In this regard they urge that the health and quality of all the timber is vitally affected by the removal of certain trees from the tract.

Although we have no doubt as to the biological validity of taxpayers' "organic unit" theory, we cannot accept it as relevant for tax purposes. A primary rule in the computation of a casualty loss deduction is that the loss incurred is to be determined "by reference to the single, identifiable property damaged or destroyed." Treas.Reg. § 1.-165–7(b) (2) (i).[11] A taxpayer may not

---

11. The taxpayers argue that this Regulation, published January 16, 1960, to be applicable "to any taxable year beginning after the date of the publication," is inapplicable to this case, since the taxable year here in question commenced January 1, 1960. However, we need not resolve this precise issue because we regard the Regulation as merely an exemplification of the manner in which the statute has consistently been interpreted. See, e.g., Carloate Industries, Inc. v. United States, 354 F.2d 814 (5th Cir. 1966); United States v. Koshland, 208 F.2d 636 (9th Cir. 1953).

borrow basis from his unharmed property in order to increase the amount of his loss deduction for an injury to his other property. Thus, all agree that the taxpayers may not apply their basis in the land on which the timber tract is situated to their loss of trees. Yet were we to take their "organic unit" theory seriously, logic would require us to do just that, for surely the health of the timber is even more dependent upon the soil in which it is rooted than on the existence of other trees.

Moreover, it is essential to note that although taxpayers claim that the destruction of some trees reduced the value of the whole tract by decreasing its density and increasing the susceptibility of the remaining trees to damage, they have not even attempted to assign a dollar amount to this loss. Rather, as noted, they have estimated the whole amount of their claimed loss (approximately $130,000) solely in terms of the board feet of timber actually destroyed. Since the burden is always upon the taxpayer to establish the amount of his loss, we must conclude that the taxpayers have failed to show any loss to the remainder of their tract.

Furthermore, in view of the requirement that the amount of a casualty loss be determined solely with reference to the property destroyed, we believe that the Commissioner's analogy of a partial destruction of timber to a partial sale of such timber is eminently justified. The salient fact is that property of the type involved in this case is usually merchanted by means of partial sales. Thus, the Commissioner's contention that timber is commercially divisible into units of board feet is amply supported by the fact that it is actually sold in such units in the ordinary course of business.

In addition, the Commissioner's determination is supported by the presumption inherent ·in the Code that gain or loss upon an involuntary conversion of property (e. g., a conversion resulting from a destruction, theft, or condemna-

tion of property) is, as a general rule, to be computed in the same manner as on a voluntary conversion of such property. Thus, § 1001(a) prescribes the method of computing gain or loss "from the sale *or other disposition of property*." (Emphasis added.) And § 1011, referred to in § 1001(a), similarly prescribes the method of ascertaining "[t]he adjusted basis for determining the gain or loss from the sale *or other disposition of property*." (Emphasis added.) Compare § 1002 dealing with recognition of gain or loss on the "sale or exchange" of property. Nor can it be doubted that the broadly inclusive term "disposition of property" includes a destruction of the property by an involuntary conversion such as that caused by the ice storm in this case. See, e. g., § 1033.

The taxpayers have constructed a horrible hypothetical designed to demonstrate the claimed anomaly of the Commissioner's determination. What if, they say, there were to be a selective ice storm or other disaster which would single out only young trees for destruction? Our answer is that under the Commissioner's analysis two results, neither of which is at all anomalous, are possible. If the taxpayer had planted the young trees or otherwise obtained them at some cost, then he would have a basis allocable to those trees separate from his basis in the merchantable timber. See Treas.Reg. § 1.611–3(d) (3). He would then be able to deduct his loss in the young trees to the extent of that basis or their decline in market value, ·whichever was less. If, on the other hand, the new growth was regeneration which had occurred at no cost to the taxpayer he would have no allocable basis, and would not be entitled to any deduction for the loss. If the taxpayers take issue with this result, it can only be because they disapprove of the basic principle applicable to all casualty loss—that a taxpayer may take no deduction for the destruction of property in which he has no basis. The owners of timber incurring a partial loss are entitled to no

more sympathy than the owners of other property who are similarly prevented from deducting their losses by a lack of allocable basis.

Finally, it is important to note that under the Commissioner's rule, the petitioners are proportionately no worse off in the case of a partial loss than they would be under the rule they seek in the event of a total loss of all the timber on the tract. Thus, had the entire tract of timber been destroyed by the storm, the taxpayers would inevitably be limited to a deduction of $212,476.30 (their basis in the tract), despite the fact that the market value of their loss would be far greater. Under the Commissioner's analysis, they are in relatively the same position in the circumstances before us, since they are permitted a deduction up to a percentage of their basis in the tract equal to the percentage of the timber lost. Also, it is apparent that the rule they seek would place them in a far more advantageous tax position in the case of a partial destruction of timber than they would enjoy had the entire tract been lost—a result which really is anomalous.

In sum, we believe that basic principles applicable to the deduction of casualty losses generally confirm the correctness of the Commissioner's interpretation of the relevant statutory provisions.

### V.

Finally, we note that we are supported in our conclusions by the latest case on the subject and the only one called to our attention dealing specifically with a partial loss of depletable timber. Harper v. United States, 396 F.2d 223 (4th Cir. 1968) (per curiam), affirming 274 F. Supp. 809 (D.S. C.1967). In *Harper*, the Fourth Circuit held, as we do here, that the amount of a casualty loss deduction allowable under § 165 for the partial destruction of a timber tract is limited to the taxpayer's adjusted basis in the timber actually destroyed. The taxpayers here attempt to avoid the application of *Harper* to them by noting that the taxpayer there estimated the amount of his loss solely in terms of the amount and value of the timber actually destroyed, not in terms of the decline in value of the whole tract affected. But this claimed distinction is ephemeral. In the instant case also, the taxpayers assessed their loss of market value in the tract solely in terms of the individual trees actually destroyed by the storm. Although they, like the taxpayer in *Harper*, claim that the value of the timber remaining on the tract has been diminished by the casualty, they have not assigned any dollar amount to this alleged loss.

Failing to distinguish *Harper*, the taxpayers attempt to prove it erroneous in light of prior cases on the subject. To summarize, they claim that the Commissioner's determination in this case is merely a resuscitation of the previously discredited percentage of basis rule. Under that rule, the amount allowable as a casualty loss deduction for the partial destruction of any property was limited to a percentage of the taxpayer's basis in the property equal to the ratio of the loss in value of the property as a result of the casualty to the value of the property immediately before the casualty.[12] Since the Commissioner's allocation of basis per unit of merchantable timber leads to a result approximately the same as the percentage of basis formula would, taxpayers urge, the Commissioner's result must also be discredited.

We find this syllogism unconvincing because it completely ignores the reasons why the percentage of basis rule was discarded—reasons which have no application to the Commissioner's determination in this case. Thus, in Helvering v. Owens, 305 U.S. 468, 59 S.Ct. 260, 83

---

12. The percentage of basis formula is:

$$\text{adjusted basis in the property} \times \frac{\text{value lost by casualty}}{\text{value before casualty}} = \text{percentage of basis limiting casualty loss deduction}$$

L.Ed. 292 (1939), where the Supreme Court rejected the use of the percentage of basis rule for partial loss deductions with respect to nonbusiness property, the property actually involved was an automobile. Unlike a tract of timber, an automobile is both functionally and commercially a single unit. It cannot be divided into smaller parts without destroying both the utility and the value of the whole. We therefore do not read *Owens* as reaching the question whether the partial destruction of a property ordinarily separable into smaller units for commercial purposes should be treated in the same manner as a partial sale of such property. Furthermore, the Fifth Circuit, holding in Alcoma Ass'n, Inc. v. United States, 239 F.2d 365 (1956), that the *Owens* rule also applied to business property, specifically recognized the possibility that a percentage of basis rule might still be appropriate in the case of property readily divisible, and deliberately refrained from deciding this issue because it had not been presented to the court. Accordingly, *Alcoma* did not in any way discredit a pro rata allocation of basis in the case of a partial destruction of property as readily divisible as timber. All that the court decided was that the property there involved could not be distinguished from the property in *Owens* for the purpose of applying the percentage of basis rule solely on the ground that it was business rather than nonbusiness property.

Taxpayers further complain that the Commissioner's analysis discriminates against them vis-a-vis the owners of ornamental or fruit trees who are permitted a deduction for a partial loss to the extent of their basis in all the trees taken as a unit. Treas.Reg. § 1.165–7(b)(2) and (3). Without expressing any opinion as to the correctness of that treatment, we need merely point out that such properties are distinguishable in an important respect. The divisibility of the timber involved in this case derives from two related factors: that the individual trees are fungible, and that, when mature, they are cut and sold in

units as an end product. While ornamental and fruit trees do share with timber the former characteristic of fungibility, they lack this latter characteristic. Since of these three types of trees only timber has the quality of being used up in units as an end product, it only is given a depletion deduction, which, as set forth above, provides a method of computing allocable basis as partial sales are made. Because of this essential difference between timber and ornamental and fruit trees, we find no incongruity or unfairness in the Commissioner's determination.

The decision of the Tax Court is affirmed.

MOORE, Circuit Judge (dissenting):

The issue to be determined is how to measure an uninsured casualty loss to a timber tract. In an attempt to sustain the Commissioner's position, the majority find it necessary to go through a series of difficult contortions which have absolutely no relation to the casualty loss provision. In so doing, the majority disregard the only salient inquiry in the case, namely, what was the intent of Congress in enacting the casualty loss deduction in relation to these timber owners.

While discerning the intent of Congress is often a difficult objective for a court to achieve, there is no dispute that the limit on a casualty loss deduction is the basis of the property damaged or destroyed. The problem is what is the " property " here. Although conceding that the single timberland becomes two separable properties for tax purposes (the land and the trees), the majority artificially seek to break down the same property further for casualty loss purposes, defining each tree as separate property and assigning to each an adjusted basis (measured in board feet) of its own. Trees not measured in board feet are simply deemed by the majority opinion to have an adjusted basis of zero, which is certainly very convenient in their effort to rationalize the Commissioner's position. The difficult aspect of

this theory is that there is no provision, or combination of provisions, in the Code which justifies it. No statutory support exists for assigning to each tree on a timber tract a basis of its own for the purpose of determining a casualty loss deduction. The effect of the majority's effort is to create such a provision by judicial fiat and unjustly to limit the taxpayers' deductions. The result, wholly unwarranted as a matter of law, fact or reason, is to attribute to a timber tract characteristics of a lumber yard, with the entire inventory of wood cut and stacked in piles, while denying to the tract its organic qualities.

In reaching this conclusion, the majority have virtually ignored the relevant regulations under the casualty loss provision, the history of Internal Revenue's treatment of partial casualty losses, prior case law and inconsistent tax treatment of areas closely related to timber where the full extent of casualty loss has been allowed. In fact, the opinion fails to discuss an inconsistency even closer to home, namely the different treatment the Commissioner accords to large and small timber involved here, allowing only a partial deduction for the large trees destroyed, yet permitting full deduction for small trees. Because these factors point strongly to a contrary conclusion and since the majority have chosen to disregard them, I find it necessary to dissent.

There is no disagreement as to the basic facts concerning the casualty loss.

On March 2, 1960 an ice storm severely damaged the timber on the joint venture's tract, reducing its fair market value, as the Tax Court found, by at least $130,000. The loss of timber, which was widely scattered throughout the tract, was estimated to be 4,757,000 board feet of saw timber [1] and 5,058.3 cords of pulpwood, [2] as well as loss of young growth [3] and plantations. [4]

The joint venture deducted $130,500.38 as a casualty loss on its 1960 partnership informational return and the taxpayers took the appropriate percentage on their tax statements for the same year. The amount so deducted represented the fair market value of the saw timber, pulpwood, young growth and plantations destroyed by the storm. The fair market value of the saw timber destroyed as of March 2, 1960 was $104,787.29; the value of the pulpwood destroyed was $11,634.09; the value of the young growth amounted to $12,173 and the value of the plantations was $1,906.

The Commissioner in his deficiency notice, while allowing the $1,906 claimed as damage to the plantations, disallowed all but $17,315 of the remaining amount claimed as a casualty loss. The Commissioner permitted a deduction for the saw timber alone and computed the deduction by multiplying the unit rate for depletion, $3.64 per 1,000 board feet, by the estimated 4,757,100 board feet of saw timber destroyed. This is the method for computing the deduction for depletion under Section 611. [5]

1. Saw timber consists of trees which are 8 inches or more in diameter at breast height. See footnotes 2, 3 and 4, *infra*. The saw timber is the only timber relied upon by the Tax Court.

2. Pulpwood consists of trees at least 4 inches but less than 8 inches in diameter at breast height.

3. Young growth consists of trees less than 4 inches in diameter at breast height.

4. Plantations are seedlings or trees less than 3 feet in height, planted by the taxpayers. The value of all the plantations on the tract was $19,060. Joint Appendix, p. 104.

5. "The depletion unit of timber for a given timber account in a given year shall be the quotient obtained by dividing (i) the basis provided by section 1012 and adjusted as provided by section 1016, of the timber on hand at the beginning of the year plus the cost of the number of units of timber acquired during the year plus proper additions to capital, by (ii) the total number of units of timber on hand in the given account at the beginning of the year plus (or minus) the number of units required to be added (or deducted) by way of correcting the estimate of the number of units remaining available in the account. The number of units of timber of a given timber ac-

The difference in result between the position of the taxpayers and the position of the Commissioner of Internal Revenue (the Commissioner) is, therefore, substantial. The taxpayers, if sustained, would be entitled to a deduction of over $130,000, whereas if the Commissioner should prevail the allowable deduction would be limited to $17,315.

Section 165(a) of the Internal Revenue Code (the Code) permits a deduction for casualty loss sustained during the taxable year and not compensated for by insurance or otherwise. Section 165(b) limits this deduction to not more than the adjusted basis of the property destroyed or damaged. Neither Section 165(a) or (b), nor any other section of the Code provides any specific formula for measuring the amount of the allowable deduction.

However, consistent with Sections 165 (a) and (b), Treasury Regulation § 1.-165-7(b) (1) provides in relevant part that the amount of the deductible loss "shall be the lesser of either—(i) the amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; or (ii) the amount of the adjusted basis prescribed in § 1.1011–1 for determining the loss from the sale or other disposition of the property involved." The regulations also provide that the loss incurred is to be determined " * * * by reference to the single, identifiable property damaged or destroyed." [6] Reg. § 1.165–7(b) (2) (i).

Petitioners maintain that the "single, identifiable property damaged" is the partially damaged timber tract, containing injured trees as well as those which were spared. Certainly a timber tract is aptly described by the phrase "single, identifiable property." The Commissioner and the Tax Court admit that the 24,605.6 acres were operated as a single tract, and were managed and depleted as an operating unit. This is what the taxpayers purchased; they did not acquire, as the majority contend, individual trees or a specified number of board feet of timber. The tract is, therefore, both "single" and readily "identifiable." Taxpayers persuasively maintain that the "adjusted basis limitation" for a casualty loss deduction, established by Section 165(b), is the adjusted basis of the entire tract of timber, entitling them to deduct the full extent of their $130,500.38 loss, since it is less than the adjusted basis of $212,476.30 in the whole tract.

There is no dispute that petitioners' timber tract did suffer at least $130,000 in damage as a result of the ice storm and that they have not been compensated by insurance or otherwise. But the Commissioner seeks to limit their deduction to a significantly smaller amount. He maintains that petitioners should only be permitted a casualty loss deduction on the estimated 4,757,000 board feet of saw timber damaged or destroyed, but not for the other types of timber injured—namely, the pulpwood and the young growth. Under the Commissioner's theory, only the saw timber has an adjusted basis. Specifically, he insists that the "single identifiable property damaged or destroyed" is each individual tree that was harmed. He asserts that each tree has its own adjusted basis, measured in board feet, and that trees not measured in board feet have no adjusted basis. In effect, the Commission-

---

count cut during any taxable year multiplied by the depletion unit of that timber account applicable to such year shall be the amount of depletion allowable for the taxable year." Reg. § 1.611–3(b)(2).

6. This regulation is "applicable to any taxable year beginning after January 16, 1960." Reg. § 1.165–7(e). Petitioners make a token resistance to the application of this provision to them because the taxable year at issue on this appeal began prior to January 16, 1960. However, the *amici* concede and we agree that the regulations and, especially the phrase "single, identifiable property damaged or destroyed," are merely interpretative of the statute. Since they are consistent with the statute, they are applicable to the calendar year 1960.

er contends that the petitioners ought not to be better off from a casualty than from a sale. The Commissioner premises his position on "the inter-relationship of the Code provisions relating to the timber investor and the taxpayer who seeks a casualty loss," and on the authority of the per curiam decision in the Fourth Circuit, *Harper v. United States*, 396 F.2d 223 (1968), affirming 274 F.Supp. 809 (D.S.C.1967), which was decided after the Tax Court decision in the instant case.

As the majority concede, no section of the Code, or combination of sections, specifically mandates the result the Commissioner seeks, his position is essentially an argument by inference from the statute. There is no disagreement that Section 165(b), in establishing the maximum amount for an allowable deduction for casualty loss, sets this limit by reference to Section 1011. Section 1011 and its numerous cross references tell us nothing except that "the basis of property shall be the cost of such property," after adjusting for deductions taken in computing income. The cross references in Section 1011 are to Section 1012, which defines basis as cost, and to "other applicable sections of this subchapter [namely, Subchapter O] and subchapters C, K and P." No depletion provisions are located in Subchapter O or in Subchapters C, K or P. Thus, by the express terms of the statute, the maximum deductible loss for a casualty seems to be the cost, as adjusted, of the property damaged or destroyed, and in this case the limit would be the adjusted basis of the timber tract.

The taxpayers argue quite reasonably that the "property" referred to in Section 1011 and Section 1012 is the entire timber tract. The depletion sections, on which the majority rely, define property on which depletion is to be allowed as "an economic interest in standing timber in each tract or block representing a separate timber account." Reg. § 1.611–1 (d) (1). Likewise, Section 612 makes apparent that the "basis for cost depletion" is the adjusted basis of the entire

timber tract. Certainly this is the property the taxpayers purchased and this is the property which is depleted when timber is cut and sold. Nothing in either Section 165, 1011 or 1012 even suggests, let alone requires, that the cost of the tract for casualty loss purposes should be allocated to individual trees. If the depletion provisions recognize that the "property" on which depletion is to be allowed is the tract of timber, it is even more persuasive that the adjusted basis of the whole tract sets the limit on a casualty loss deduction.

The majority reject this approach as "overly simplistic" and instead adopt the more tortuous route of the Commissioner. Essentially, the argument of the Commissioner, adopted by the majority, is that when timber is sold it is sold in units of board feet and a depletion deduction is allowed. Because this depletion deduction represents allocated cost, the argument runs, it should be the limit of the taxpayers' casualty loss, just as the cost of lumber destroyed in a lumber yard would set the maximum deduction.

In support of his position that the limit of petitioners' deductible loss is the depletion allowance they would have received had the timber been sold rather than destroyed, the Commissioner refers to Section 631(a). This section permits a taxpayer to make an election to treat the cutting of timber rather than its sale as the taxable event. It provides that "gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, and the *adjusted basis for depletion* of such timber in the hands of the taxpayer." [Emphasis added.] The "adjusted basis for depletion" is defined in the regulations as equivalent to the depletion deduction for timber provided in Section 611. Reg. § 1.631–1(d).

The Commissioner draws the inference that "adjusted basis for depletion" in Section 631(a) must be equivalent to "adjusted basis" provided in Section 1011, and thus be the limit on an allowable casualty loss. He argues that to apply "adjusted basis" in one way to

calculate gain or loss and depletion and in another way to fix the allowable casualty deduction would be inconsistent with established canons of statutory construction.

The *amici* contend that this phrase, "adjusted basis for depletion," is used in Section 631(a) for convenience alone. Although this suggestion is made with some diffidence due to the absence of any legislative history to support it, some support is available since no provision of the Code defines the phrase, as would normally be expected. Additionally, "adjusted basis" in Section 631(a) is qualified by "for depletion," thus indicating that it is to be used in depletion situations only. According to the regulations "the depletion of timber takes place at the time timber is cut." Reg. § 1.611–3(b) (1). Furthermore, Section 631(a) is the only place in the Code where the phrase occurs and that section has no bearing on the problem before us. There is also no reference in Section 631(a) to "adjusted basis" in Section 1011 or to the "adjusted basis limitation" for casualty losses in Section 165(b). More importantly, there is no reference in Section 1011 or in Section 165(b) to any depletion provision. It is quite apparent then that if Congress had intended the result the Commissioner now seeks, and specifically had intended that "adjusted basis" in Section 1011 to be the depletion deduction in Section 611, or the "adjusted basis for depletion," for the purpose of setting a maximum on a casualty deduction, it would have been very easy to have so worded the statute, namely, by including the appropriate reference in Section 1011.

In the absence of such a reference, the majority seek to create one through the vehicle of "allocated cost." Yet the purpose of cost depletion is to allocate a fair proportion of the basis to what the taxpayer voluntarily elects to sell in a given year. Depletion signifies the process of using up capital assets in normal business operations. For tax purposes, cost depletion is an allowance from income for the exhaustion of such capital assets.

Were all revenue from the cutting and sale of timber from a timber tract treated as gain, taxpayers would be taxed in part on return of capital. But provisions allowing a limited annual deduction for normal exhaustion during regular business operations have no place in determining the amount deductible from uncompensated casualty losses. As the Board of Tax Appeals stated "the provisions of law governing depletion allowances do not extend to the determination of deductible losses on account of storm, fire or other casualties." Lock, Moore & Co., Ltd. v. Commissioner, 7 B.T.A. 1008, 1011 (1927). Since casualties frequently can and do result in very substantial and irregular damage to property, the reasons for the application of cost depletion, which provide simply for *regular* and *limited* annual deductions, are not present. Additionally, there is no explicit cross-reference in the casualty loss provisions to depletion sections. There is also no legislative history offered or found which would justify the use of cost depletion in casualty loss situations. It is thus the normal shrinkage in quantity of timber due to its use or sale that the depletion allowance of the statute is designed to take care of and not extraordinary losses due to casualties. Lock, Moore & Co., Ltd., *supra* at pages 1010, 1011.

To a great extent, the same is true with depreciation. Depreciation also signifies the consuming of capital assets. For tax purposes, it is an allowance from income for wear and tear to such capital assets. But to require a taxpayer who suffered a casualty loss to deduct only a proportion of his basis, which fraction was less than the loss suffered and which coincides with the depreciation he would have received had the basis been adjusted over a period of time, would deny him the full deduction Congress expected him to receive when it enacted Section 165. See discussion *infra*. Similarly, to insist on the use of cost depletion for determining the allowable loss deduction for damage to a timber tract is to insist on pro rata treatment with respect to partial

casualty losses. Such a result is also contrary to the ordinary deduction Congress intended.

Since the "property" which the taxpayers purchased was the timber tract and not each specific tree on the tract, as contended by the majority, the adjusted basis of that "property" establishes the limit on an allowable casualty loss deduction. The depletion provisions on which the majority themselves rely indicate that the "property" on which depletion is to be taken is the entire timber tract. Reg. § 1.611–(d) (1); Section 612. The timber tract is clearly the "property" being depleted. The error the majority make is in looking solely to the amount of cost allocable to saw timber when it is sold, rather than on focusing on *what the property was the taxpayers purchased* and *on the basis of that property*. When the timberland was bought in 1951 and 1956, the taxpayers divided the purchase price between the land and the timber. Each became separate property and each had its own basis.

It may be conceded for argument purposes that generalized damage to a tract can be broken down into its component parts and the taxpayers have done this by specifying types of timber injured. But the majority seek to go even further by dividing the tract into each specific tree and assigning an adjusted basis—the depletion allowance—to each. The majority claim that the latter sets the maximum amount for an allowable casualty loss. But they have, in fact, missed the forest for the trees.

No one disputes that the most taxpayers could deduct if the merchantable timber destroyed had been cut and sold would have been the depletion allowance. However, more than *merchantable* timber was lost. Immature growth was also destroyed. The Commissioner ignores this but this is especially important to the value of the tract. As will be discussed, the market value of a tract, dependent on its future productivity, is diminished when small trees are lost. Yet the majority and the Commissioner treat the partial casualty loss to the tract of timber as substantially equivalent to a hypothetical sale of merchantable timber, even though the young growth and plantations, at least, and perhaps even the pulpwood, are of non-marketable size. Loss of immature growth is clearly damage to the tract. By limiting the taxpayers' deduction to the depletion allowance, the majority disregard the weaknesses in the analogy to partial sale of the tract.

### THE ANALOGY TO PARTIAL SALE

The Commissioner's contention that the casualty loss deduction is limited to the depletion deduction for the destroyed timber is premised on the argument that the ice storm which occurred in March, 1960 can be equated with a pro tanto sale of the injured trees. The Tax Court in approving the Commissioner's approach likewise sanctioned such analogy when it stated "[W]e conclude that where property is such that it is normally allocated a specific basis upon its disposition, as in the case of timber, a casualty loss of such property should likewise be limited to the basis of the specific property lost in the casualty.[7]

An analysis, however, of the argument based upon analogy to partial sale discloses other fallacies. A partial sale generates assets roughly equivalent to the value of the part sold, which the owner can productively re-invest. An uninsured casualty loss, on the other hand, yields no such assets and more likely the owner will find himself in need of funds to restore the property damaged. A partial sale also indicates that the property is economically divisible and it is therefore reasonable and proper to apportion the basis of the property according to what is disposed of and what is kept. A partial casualty loss presupposes no such divisibility. Often the entire damage must be replaced before the whole is again productive. Fre-

7. 48 T.C. at 527.

quently the very random character of the damage accounts for serious injury. Random damage accounted for a decrease in the timber tract's value in the present case. Due to the increased cost in removing the timber, because of the decrease in density of the tract, and due to the increased susceptibility of the tract to damage by disease, insects and storm because of the existence of fallen trees on the tract, some portions of the tract had to be "clear cut" and replanted.

To sanction the Commissioner's analogy to partial sale would be to treat the timber on petitioners' tract as identical to an inventory of cut timber, rather than as part of a vital and developing timber unit. Because a timber tract is an organic unit, an injury to it cannot be fully measured simply by estimating the number of board feet of merchantable timber destroyed. The Commissioner's position fails to give recognition to the nature of a timber tract and to the fact that its value depends primarily on its ability to produce marketable timber over a period of time without interruption or diminution. His approach ignores the fact that timber owners, including timber owners in the paper industry, invest in timber tracts in order to obtain a continuous return from their investments. The consulting forester's management of petitioners' timber tract illustrates this very point. Generally only half of the self-generated immature growth in an area is cut in one year, thereby insuring that marketable timber is developed on a consistent basis.

The Commissioner and the majority contend that there is no substantiation in this record for any claim of monetary damage to the tract itself. The majority asserts, therefore, that a casualty loss to a timber tract should not be treated differently from losses on voluntary sales. Under their theory, since timber is commonly sold in units with an appropriate deduction for depletion, the Code provisions for cost depletion should be used in dividing up the basis under Section 165(b). The fallacy with this theory, as noted earlier, is that trees of *non-merchantable size* were destroyed. Even under the majority's view, since such timber is not normally sold in units, it can only be considered as inherently part of the timber tract. If a selective hypothetical storm destroyed only the young growth on a tract, leaving the larger trees intact, a serious loss *to the tract itself* would result. The majority err when they claim that the taxpayers have no basis in the young growth. The taxpayers do have basis in *the tract,* and loss of small trees, which are not salable as an end product, can only be considered as damage to the tract itself. Not to permit a deduction for such loss means that the resultant decrease in the value of the tract goes unrecognized and the owner forced to bear the uncompensated loss without deduction.

Furthermore, according to the appraiser's report introduced at trial, based on 51 random plots over six days of inspection, about 43 percent of timber 4 inches at breast height and 47 percent of the 6 inch timber (pulpwood) were lost, as well as 28 percent of the 8 inch timber, 22 percent of the 10 inch timber, 13 percent of the 12 inch timber and 6 percent of the 14 inch timber (saw timber). The Tax Court stated "The facts show that from the standpoint of either the fair market value of the timber destroyed by the ice storm or the difference in the value of the joint venture's entire tract of timber before and after the storm, the joint venture sustained a loss of approximately $130,000." 48 T.C. at 523. The taxpayers have, therefore, clearly established a record supporting the decline in value of the tract which they claimed. Treating the casualty as a partial sale—that is, as equivalent to a sale of an estimated amount of timber destroyed—has the effect of unrealistically limiting the property involved in the casualty and excluding from consideration a number of significant consequences which must be taken into account if the taxpayers are to receive the full relief with respect to their economic loss Congress intended.

## Pro Rata Treatment of Casualty Losses

### A. Prior Treatment

In addition to the weaknesses of the majority's theory noted above, the majority opinion also fails to consider the previous policy of Internal Revenue in administering the casualty loss provision and the case law which developed in relation to that policy. As will be seen below, pro rata treatment for casualty loss has been held to deny the full deduction Congress intended and, subsequently, Internal Revenue abandoned its application. The taxpayers contend that the Commission in the present case permits deduction for only a fraction of the loss actually sustained, which allegedly amounts to such pro rata treatment repudiated by the Courts as well as by Internal Revenue.

Initially, the Commissioner applied a "percentage-of-basis" rule with support from some early cases in the Board of Tax Appeals. Fred Frazer, 10 B.T.A. 409 (1928); G.C.M. 6122, VIII–2 C.B. 115 (1929); Harry Johnston Grant, 30 B.T.A. 1028 (1934). Under this percentage formula, the amount allowable as a deduction was limited to a percentage of the taxpayers' basis which equaled the ratio between the decrease in value after the casualty and the value of the property immediately before the casualty.[8]

Subsequently, however, the percentage-of-basis rule was dropped in determining the amount of an allowable casualty loss in respect to non-business property. Instead of pro rata treatment, the deduction allowable became the lesser of (1) the difference between the value of the property immediately before and immediately after the casualty, or (2) the adjusted basis for determining the loss from the sale or other disposition of the property. G.C.M. 16255, XV–1 C.B. 115 (1936).

This full deduction approach was ratified by the Supreme Court in Helvering v. Owens, 305 U.S. 468, 59 S.Ct. 260, 83 L.Ed. 292 (1939), where the Court applied the formula to an automobile partially damaged by fire. The Court held that Congress intended the amount deductible to be the *actual* loss sustained, limited by the adjusted basis of the property. *Id.* at 471, 59 S.Ct. 260.[9] As the Commissioner concedes, the rationale of the Court in *Owens* cast doubt on the percentage-of-basis formula. Commissioner's Brief at page 18. It is evident that the validity of the analogy to partial sale, which is at the heart of the percentage-of-basis rule, was also undermined. Following the *Owens* decision, Internal Revenue applied this full deduction rule to non-business real estate not held for investment, holding that the maximum loss allowable was the adjusted basis of the entire property. G.C.M. 21013, 1939–1 C.B. 101.

During this period the Commissioner did not require allocation of the taxpayers' basis between land and improvements. Subsequently, a requirement that basis be allocated between land and buildings was imposed. United States v. Koshland, 208 F.2d 636 (9th Cir. 1953), firmly established allocation for business property. It is now recognized that a taxpayer must allocate his basis between depreciable fruit trees and the land on which they stand, Carloate Industries, Inc. v. United States, 354 F.2d 814 (5th Cir. 1966). The same is true for depletable timber, see Estate of Sam E. Broadhead, 25 CCH T.C.M. 133 (1966),

---

**8.** Percentage-of-basis formula can be simply stated in the following terms:

$$\text{Amount deductible as a casualty loss} = \text{Adjusted basis} \times \frac{\text{Decrease in Value due to casualty}}{\text{Value before casualty}}$$

**9.** In the *Owens* case the adjusted basis of the car was in excess of the market value of the car before the accident.

aff'd on other issues, 391 F.2d 841 (5th Cir. 1968).

Despite the fact that the Supreme Court's rationale in *Owens* weakened the continued validity of pro rata treatment, and even though it had been discarded as to non-business property, G.C.M. 16255 and 21013, the Commissioner continued to apply the percentage-of-basis formula to business property where basis had been allocated between land, structures and other improvements. For example, while basis had to be allocated between a building and the land on which it stood, the Commissioner continued to limit the allowable casualty loss deduction for damage to the building only to a percentage of the building's basis.

But in Frank R. Hinman, 12 CCH T.C. M. 1347 (1953), the Tax Court failed to apply the percentage formula to a partially damaged farm. The taxpayers in *Hinman* suffered a loss from a flood which rendered valueless for farming 58 percent of their 264.8 acres. In authorizing a deduction of their entire $12,875 basis, the Court made no suggestion that a pro rata or percentage deduction was required—that is, to permit a deduction of only 58 percent of their $12,875 basis—or that the loss should be treated as a pro tanto disposition or sale of acreage rendered unprofitable by the flood.

However, two years later in Bessie Knapp, 23 T.C. 716 (1955), the Tax Court did apply the percentage-of-basis rule to citrus orchards damaged by a two-day freeze. The taxpayer there was only allowed a deduction for a percentage of the adjusted basis of the orchard, which percentage equalled the ratio of the decrease in value resulting from the freeze and the value before the freeze. The Commissioner thereafter pressed for

the application of a pro rata rule for partial casualty losses, until Alcoma Ass'n, Inc. v. United States, 239 F.2d 365 (5th Cir. 1956).

In *Alcoma* the taxpayer claimed a deduction on account of hurricane damage to a citrus grove. The storm had caused a decrease of $191,000 in the value of the grove, which amounted to 12 percent of the value of the grove before the hurricane. The adjusted basis of the grove before the storm was approximately $523,000. The taxpayers claimed a deduction for the full $191,000, but the Commissioner, relying on *Bessie Knapp, supra*, sought to allow only a pro rata deduction, namely, 12 percent of the taxpayer's $523,000 adjusted basis, or some $63,700. The District Court accepted the Commissioner's formula.

Shortly after the District Court's approval of the Commissioner's method, the Treasury issued a proposed regulation adopting the percentage-of-basis formula.[10] However, on appeal the Fifth Circuit rejected the formula and the partial sale analogy is inconsistent with the Supreme Court decision in *Owens* and with Congressional policy to allow deduction for the full amount of uncompensated losses. The Court, unanimously reversing the District Court, stated:

> \* \* \* this question has not been left entirely open. The Supreme Court's decision in Helvering v. Owens \* \* has explicitly determined that allowable casualty loss is to be the actual decrease in the market value of the property, measured by the difference in market values immediately before and immediately after the casualty, but limited to the total adjusted basis of the property. *Id.* at 367.

10. The pertinent provisions in the proposed regulation are that "[i]n the case of a casualty loss incurred in a trade or business, or in connection with any transaction entered into for profit, where the destroyed or damaged property has at all times been devoted to business or income-producing purposes in the hands of the taxpayer, the deductible loss will be the proportion of the adjusted basis determined under section 1011 which the value of the destroyed property bears to the value of the entire property, reduced by an insurance or other compensation received in respect of the property." Prop. Reg. § 1.165–3(c), 21 Fed.Reg. 4925, 4927 (July 3, 1956). See footnote 8, *supra.*

No appeal from this decision was taken by the Commissioner.

Thereafter, in October 1959 the regulations rejected by *Alcoma* were withdrawn and new proposed regulations were issued. These were later adopted on January 15, 1960 and became Section 1.165–7(b) (1) of the Regulations. As indicated previously, they provide in substance that the amount of the deductible loss as to both business and non-business property is the full economic loss sustained within the limits of the adjusted basis of the property. As to business property totally destroyed by a casualty, the amount deductible is the adjusted basis of such property even if the fair market value before the casualty is less than its adjusted basis.

The history of the Commissioner's treatment of partial casualty losses makes it apparent that, having pressed unsuccessfully for pro rata treatment, the Commissioner abandoned the percentage-of-basis formula as repugnant to Congressional intent and adopted regulations permitting deduction for the full amount of the loss suffered, within the confines of the taxpayer's adjusted basis.

**B.  The Present Rule**

In the present case, the Commissioner determined the casualty loss deduction by multiplying the depletion unit, $3.64 per 1,000 board feet, by the estimated 4,757,000 board feet destroyed, the proper method for determining the depletion deduction under Section 611. The deduction was computed to be $17,315.[11] As the *amici* point out, and the Commissioner concedes, if the percentage-of-basis rule were applied to the taxpayers' tract of timber instead, the mathematical result would be substantially the same.[12] Thus the application of the Commissioner's present rule leads to the same pro rata treatment arrived at by use of the percentage-of-basis formula, although admittedly by a different route.

The Commissioner insists, however, that this demonstration "does not impeach the new rule any more than it establishes that the old rule, as applied to timber owners, is a fair and workable method." The Commissioner states that the issue is "whether the application of the present rule is so irrational that it cannot be tolerated."

11. Simply stated the calculations are:

$$\frac{\text{Unit for}}{\text{depletion}} \times \frac{\text{Timber Destroyed}}{\text{(in board feet)}} = \frac{\text{Present Deduction}}{\text{for Casualty Loss}}$$

$$\frac{\$3.64}{1,000 \text{ board feet}} \times \frac{4,757,000 \text{ board feet}}{} = \$17,315$$

$$\frac{\$212,476}{58,445,000 \text{ board feet}} \times \frac{4,757,000 \text{ board feet}}{} = \$17,315$$

12. Simply stated, the calculations are (see footnote 8):

$$\frac{4,757,000 \text{ board feet}^*}{58,445,000 \text{ board feet}} \times \$212,476 = \$17,315$$

\* The value of the tract before the storm does not appear in the record, and it is, therefore, not possible to make the precise computation. The use of the quantity of saw timber rather than the value of the tract in the computation should produce approximately the same answer; any difference in result is due to the fact that the depletion rate is uniform for each board foot of timber on the tract even though the value of the timber varies by species and accessibility and to the further fact that losses to young growth and the effect on the value of the remaining timber is not, under the Commissioner's rule, included in the computation. The point remains true, however, that the Commissioner's approach permits a deduction for only a part of the loss sustained by the taxpayer.

The real question, however, is whether the Commissioner's position is inconsistent with the statute. As noted, the percentage-of-basis rule was rejected in *Alcoma* as contrary to the statute, and the regulations authorizing that formula were withdrawn. In view of the conclusion reached in *Alcoma* that pro rata treatment was without analytical or statutory support and inconsistent with Congressional policy allowing full deduction for partial casualty losses, which conclusion was based on the Supreme Court's decision in *Owens*, I see no reason why the identical result should now be viewed differently.

THE REGULATIONS

Notwithstanding the arguments above, the Commissioner asserts that the regulations require that petitioners' deductions be limited to the depletion deduction authorized by Section 611. Given the technical and intricate nature of the tax provisions, as well as the fact that Congress has delegated to the Secretary of the Treasury (or his delegate), under Section 7805(a) of the Code, the power to prescribe "needful rules and regulations" for the enforcement of the Code, the Commissioner argues that appropriate weight should be given to his interpretation of the casualty loss provision because of his administrative expertise. However, because the majority opinion does not even refer to the regulations under the casualty loss provision, the majority impliedly recognize that the Commissioner's own regulations not only fail to support him, but in fact undermine his position. The implication is justified on a reading of the relevant regulations under Section 165.

The Commissioner claims that Section 1.165–7(b) (2) of the regulations supports his position. The validity of the regulation has been upheld in *Carloate Industries, supra.* The regulation elaborates the method of calculating the allowable loss deduction. It provides:

(2) *Allocation of property for computing loss.*

(i) A loss incurred in a trade or business or in any transaction entered into for profit shall be determined under subparagraph (1) of this paragraph by reference to the single, identifiable property damaged or destroyed. Thus for example, in determining the fair market value of the property before and after the casualty in a case where damage by casualty has occurred to a building and ornamental or fruit trees used in a trade or business, the decrease in value shall be measured by taking the building and trees into account separately, and not together as an integral part of the realty, and separate losses shall be determined for such building and trees.

It is evident that loss shall be measured by taking buildings and trees into account separately. Thus a building is one property and trees are separate property. The Commissioner maintains that the "single, identifiable property damaged or destroyed" in the instant case is each separate tree that was damaged or destroyed and which has an adjusted basis of its own, measured in board feet. Therefore, he asserts that each injured tree must be considered apart from undamaged trees.

However, far from assisting the Commissioner, the regulation itself makes no such distinction. The regulation does not differentiate between fruit or ornamental trees which were damaged and those which were spared. In fact, it is apparent that the regulation treats all the trees as a unit or as the "identifiable property," separate from land or buildings. It directs that "separate losses shall be determined for such building and trees." The Commissioner thus asserts a distinction between damaged and undamaged trees when his own regulations do not so distinguish. Further, these very regulations were proposed for the purpose of making Internal Revenue's policy consistent with *Owens* and with *Alcoma*, and *Alcoma* made no distinction between damaged and undamaged trees in a citrus grove.

The Commissioner seems to recognize the merit in this point because he explicitly allowed the $1,906 loss deduction claimed by petitioners for the value of the plantations. The $1,906 represented destruction of 10 percent of the tract's plantations. This deduction was permitted without differentiation between damaged and undamaged plantations. No explanation is given for this allowance, but a serious inconsistency in the Commissioner's position is evident. That is to say, the Commissioner distinguishes in this case between damaged and undamaged saw timber, pulpwood and young growth, while allowing the full deduction of loss to plantations without making the same distinction between damaged and undamaged plantations.[13]

Since there is nothing in the statute or regulations which gives each tree an adjusted basis of its own, I agree with the petitioners and the *amici* that the "single, identifiable property damaged or destroyed" must be the entire timber tract, and the adjusted basis of the whole tract must be the limiting amount for a casualty deduction in Section 165 (b) and § 1.165–7(b) of the regulations.

DISCRIMINATORY TREATMENT

To sustain the Commissioner's position would be to sanction discriminatory treatment of casualty losses with respect to timber owners. Under the present rule, timber owners are entitled to deduct only a fraction of casualty loss suffered. But in *Frank R. Hinman, supra,* owners of a farm were permitted to deduct the full extent of a partial loss of their land due to flooding, although such a deduction eliminated all their basis in the farm. Likewise, where an improvement to land is partially destroyed by a casualty, the taxpayer is also permitted to deduct the full extent of his uncompensated loss within the limits of his adjusted basis in the entire improvement. United States v. Koshland, *supra;* Reg. § 1.165–7(b) (3), Example 2. Similarly, owners of shrubbery and ornamental or fruit trees are permitted to deduct the full extent of loss, limited by the adjusted basis in the shrubbery and trees. Reg. § 1.165–7(b) (3), Example 2. The owner of a citrus grove is also entitled to deduct the full extent of his loss so long as such deduction does not exceed the adjusted basis of the entire grove. *Alcoma, supra.* See footnote 13.

It was argued in *Alcoma* that to permit the taxpayer a full deduction of his loss would give him a windfall because he would be allowed a tax-free benefit on the appreciated value of his property. Since the damage could not be repaired, the taxpayer would allegedly have been entitled to deduct losses against the appreciated value of the tract, without having incurred any out-of-pocket expenditures. In response the Court stated:

Finally the Commissioner objects that the taxpayer's formula in effect allows him to take losses against anticipated profits from the appreciation of his property, for which he has as yet paid no taxes. This argument is deceptive. The only *real* amount is the out-of-pocket loss suffered by the taxpayer; this loss might indeed be larger than otherwise because of the (as yet untaxed) appreciation in the value and

---

13. The Commissioner, in construing the casualty loss provision with respect to orchards, has also continued to regard the orchard, and not each tree in the orchard, as the "identifiable property." This can be seen from the 1967 edition of the Farmer's Tax Guide, IRS Publication No. 225:

"ORCHARDS, TREES OR SHRUBS. When a loss occurs to farm property, the casualty will be determined by reference to the identifiable property damaged. If damage occurs to a farm building and to an orchard, both of which are a part of the same realty, the loss in value must be measured by taking each into account separately and a separate loss will be determined for the building and for the orchard." At pages 49, 50. The Commissioner has also treated hurricane damage to a citrus grove by permitting deduction for the full loss within the limits of the adjusted basis and, therefore, without distinguishing between injured and uninjured trees. See Revenue Ruling 68–531, I.R.B. 1968–41, 10.

cost of the property, but it is nevertheless a real loss. This loss can in any event be deducted only to the extent of the original investment reduced by the previously allowed depreciation. The appreciation can still be taxed when and if actually realized; if the property should later depreciate before it is sold it is the taxpayer who is ultimately injured by having suffered his loss at the time when prices and presumably replacement costs were high —he should not be penalized taxwise because he "realized" his "profits" through involuntary conversion at a time when prices happen to be high. *Id.* 239 F.2d at 370.

Therefore, since farmers and owners of citrus groves, improved real estate, shrubs and trees are entitled to deduct the full extent of casualty loss, limited by the adjusted basis in the entire farm, in the entire grove, in the entire improvement and in all the trees and shrubs, it seems reasonable and proper that timber tract owners be afforded the same treatment.

The majority contend that the farm, citrus grove and the special trees and shrubs cases are distinguishable from timber in an important respect, namely, that trees in the present case are cut and sold in units as end products. However, the Commissioner treats partially destroyed farm land as single property, even though land is obviously divisible into parcels without necessarily adversely affecting the value of the whole farm. Moreover, nothing is in the record and there is nothing in the common experience of federal judges which clearly indicates that fruit or ornamental trees, shrubs or other greenery cannot reproduce and, in fact, are not reproduced, on a self-generative basis and sold as end products. Certainly land is sold as an end product. If that be true, any distinction between timber and the above must be entirely speculative.

The argument by the majority that the taxpayers are no worse off under the Commissioner's rule than they would be in the event of total loss of all timber on the tract is not dispositive of anything. There is no dispute that the basis of the whole timber tract establishes the limit for a casualty loss deduction if there is a total loss. However, the present case involves, as the majority concede, a partial casualty loss situation. Where a farm is partially ruined by a flood, taxpayers are entitled to a deduction which may completely eliminate their basis, although part of the farm land is still usable. This is what occurred in *Hinman, supra,* and the Commissioner makes no argument that *Hinman* is wrong. The Commissioner offers no satisfactory rationale why the taxpayers here should not be accorded the same treatment.

Finally, the purpose of the casualty loss provision in the Code is to permit deductions for uncompensated loss. Timber is perhaps the classic case for application of this provision. Insurance against losses to standing timber from ice, fire, windstorm or other casualty is generally unavailable in the United States. Each timber owner is forced to bear the full brunt of such loss. See H. Chapman & W. Meyer, Forest Valuation, 349–54 (1947). If timber owners are not permitted deduction for loss to immature growth, then they must bear the decrease in value of their property without any effective offset. Yet Congress expressed its intention that casualty losses be allowed as a deduction against ordinary income to the full extent of loss. Consistent with this view, Congress determined in the 1958 amendment to Section 1231 that the deduction for casualty loss was not to be reduced or minimized by reason that timber was entitled to capital gain treatment as Section 1231 property.

The *Harper* case, *supra,* relied on by the Commissioner and the majority involved a question quite similar to that involved here; whether the taxpayer was entitled to treat as the maximum limit of the casualty loss deduction the adjusted basis of the timber standing on each tract, or whether, as contended by the Commissioner, the deduction was

limited to the amount of the depletion deduction per board foot of the estimated timber lost. In that case five tracts of timber were damaged by a hurricane. In a suit for a tax refund, rather than making a claim for a deduction with respect to the decline in value of the timber tracts, the taxpayer stipulated the amount and value of the timber physically destroyed. The District Court held, in effect, that the taxpayer had precluded consideration of the decline in value of the tract attributable to the storm because he had stipulated that his loss consisted of a specified number of board feet of damaged timber. 274 F. Supp. at 810–812. If there was any damage to young growth and plantations, the Court was not apprised of it. Here, as the Tax Court found, the record clearly established the amount of the decline in value of the tract and provides a satisfactory basis for allowing a deduction for the full economic loss.

The Court in *Harper* premised its conclusion on the analogy to partial sale, which leads to pro rata treatment for casualty loss to a timber tract and which is inconsistent with Congress' intention to allow deduction for the full amount of the loss sustained. The decision also distinguished the *Alcoma* case essentially on the ground that "there may well be a distinction between timber, grown for resale and a citrus grove, not developed for sale itself and not growing in value, but intended to produce products for resale," 274 F.Supp. at 812. The District Court also stated that *Alcoma* could be distinguished on the ground that the *Alcoma* court itself offered a number of possible distinctions between that case and the Supreme Court decision in *Owens*, on which *Alcoma* relied. The suggested distinction, relied upon by the District Court in *Harper* and by the majority here was that *Owens* involved a single car which could not be destroyed piece by piece without affecting the utility of the whole, thus indicating an indivisible "basis," whereas the citrus grove in *Alcoma* contained trees which were damaged and those which were not,

thus indicating a possible matching of basis to trees which were lost and those which were spared. However, the Court in *Alcoma* stated that it did not consider this possibility because it was not urged by the Commissioner; nor did it say that it would sustain such a distinction and the implication was that it would not. Moreover, as indicated above, damage to the timber tract cannot realistically be divided into component parts because the loss of immature growth must be treated as damage to the tract of timber itself.

In *Harper*, the taxpayer claimed a loss for only a specified number of board feet of saw timber. In the present case, the petitioners claim a deduction for casualty loss to the entire timber tract. On the facts of this case, determining loss by the method outlined by petitioners and *amici* is not only more equitable, but also within the intendment of the statute.

In sum, the casualty loss provision enacted by Congress authorizes full deduction for uncompensated losses, but not exceeding the basis of the property damaged or destroyed. In 1951 and 1956 the taxpayers purchased a tract of timber which they have managed and depleted as a single unit. They did not, as contended by the Commissioner and the majority, buy an estimated number of trees or even a specified amount of board feet of timber. Their basis in the tract is, therefore, the limit on their deduction. The taxpayers claim no more than this. The regulations under the loss provision support this conclusion. Furthermore, the Commissioner's treatment of the plantations, allowing full deduction for partial loss, supplies even more persuasive support that taxpayers are entitled to full deduction for loss to larger trees. Additionally, the history of the percentage-of-basis formula, its rejection by the Fifth Circuit and in *Alcoma* and its abandonment by Internal Revenue certainly tend to establish that pro rata treatment for partial casualty loss is contrary to the intention of Congress. Yet the Commissioner concedes that if the repudiated formula were ap-

**514**

plied to the present case, the mathematical result would be the same. If the effect of the percentage-of-basis formula violates the statute, the identical result must surely also be inconsistent with it. But even more indicative of the arbitrariness of the Commissioner's tax treatment here is that it is irreconcilable with tax treatment of similar property, namely, citrus groves, farms, shrubs and fruit or ornamental trees. The *Harper* decision is distinguishable; but in any case we are not bound by it and I would choose not to follow it.

The decision of the Tax Court should be reversed and the case remanded for further proceedings.